Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL III

| Roberto Carlos Negrón Miro<br><br>**Apelante**<br><br>V.<br><br>Municipio Autónomo de Adjuntas; José Hiram Soto Rivera<br><br>**Apelado** | TA2026AP00457 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Utuado<br><br>Civil. Núm. UT2022CV00308<br><br>Sobre:<br>Despido Injustificado (Ley Núm. 80) y Otros |
|---|---|---|

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Rivera Torres y el Juez Marrero Guerrero.

**Hernández Sánchez, Juez Ponente**

### SENTENCIA

En San Juan, Puerto Rico, a 29 de junio de 2026.

El 6 de mayo de 2026, el Sr. Roberto Carlos Negrón Miro (el señor Negrón o el apelante) compareció ante nos mediante *Apelación* y solicitó la revisión de una *Sentencia* que se emitió el 2 de abril de 2026 y se notificó el 7 de abril de 2026 por el Tribunal de Primera Instancia, Sala Superior de Utuado (TPI). Mediante el aludido dictamen, el TPI declaró Ha Lugar la *Moción de Sentencia Sumaria* presentada por el Municipio de Adjuntas. En consecuencia, declaró No Ha Lugar la Demanda Enmendada presentada por el señor Negrón.

Por los fundamentos que expondremos a continuación, ***confirmamos*** el dictamen apelado.

I.

El 9 de julio de 2022, el señor Negrón presentó una *Querella* sobre despido discriminatorio bajo la Ley ADA federal y estatal, discrimen político y represalias contra el Municipio Autónomo de Adjuntas (Municipio), su alcalde, el Sr. José Hiram Soto Rivera (señor Soto) (en conjunto, la parte apelada) por sí y en representación de la Sociedad Legal de Gananciales compuesta por él y su esposa, la Sra. Luz Esther Rivera (señora Rivera), entre otros, al amparo del

procedimiento sumario de reclamaciones laborales establecido por la Ley Núm. 2 del 17 de octubre de 1961, según enmendada, 32 LPRA sec. 3118, *et. seq.* (Ley Núm. 2).[1] Alegó que comenzó a laborar para el Municipio de Adjuntas el 2 de marzo de 2015 bajo la administración del entonces alcalde, el Sr. Jaime Humberto Barlucea Maldonado. Sostuvo que fue contratado como guardián y que desempeñó funciones de seguridad en distintas instalaciones municipales.

Indicó que era empleado por tiempo indeterminado ya que el Municipio le reconocía el derecho de acumular beneficios tales como licencias de vacaciones, enfermedad y bono de Navidad. Asimismo, alegó que laboró para el Municipio durante aproximadamente siete (7) años y que durante todo ese tiempo gozó de buena reputación, poseía las destrezas y conocimientos necesarios para desempeñar sus funciones y nunca fue objeto de amonestaciones ni acciones disciplinarias. Además, sostuvo que, luego de dos (2) años ocupando el puesto de guardián, tenía derecho a ocupar una plaza permanente o que ya se había convertido en un empleado a término indeterminado del Municipio. En la alternativa, alegó que el Municipio fue negligente al no nombrarlo a una plaza permanente o de carrera.

Por otro lado, expresó que, participaba activamente junto a su familia en actividades del Partido Nuevo Progresista y que dicha afiliación política era conocida por la parte apelada. Sostuvo que, tras el cambio de administración municipal, el nuevo alcalde, el señor Soto, afiliado al Partido Popular Democrático, incurrió en discrimen político y represalias en su contra lo que resultó en su despido el 31 de enero de 2022, sin que existiera justa causa para ello. Como parte de los actos discriminatorios y represivos alegados, sostuvo que fue humillado por el alcalde durante una reunión con empleados municipales, que se le modificaron horarios y lugares de trabajo, que se le dificultó acceso a la administración municipal, que fue enviado de vacaciones de forma ilegal, que se le exigió registrar su asistencia en

---

[1] *Véase*, Entrada Núm. 1, SUMAC TPI.

un lugar inapropiado y distante de su área de trabajo, y que finalmente se le despidió o no se le renovó el contrato.

Asimismo, alegó que antes de su despido, contrajo COVID-19 y que, tras ausentarse de sus labores por dicha razón, fue despedido por razón de su condición de salud, en alegada violación de la legislación ADA federal y estatal. También sostuvo que, al reclamar diversos derechos laborales y presentar quejas ante Recursos Humanos y ante el señor Soto, fue objeto de represalias en alegada violación de la Ley Núm. 115 de 20 de diciembre de 1991, según enmendada, conocida como *Ley de Represalias contra el Empleado por Ofrecer Testimonio*, 29 LPRA sec. 194, *et seq.* (Ley Núm. 115). Afirmó que, sus reclamaciones no fueron atendidas y dejó de presentar otras por temor a perder su empleo.

Finalmente, alegó que los actos discriminatorios, las represalias, el alegado despido ilegal y la conducta de la parte apelada le ocasionaron daños emocionales, angustias mentales y pérdidas económicas. Por ello, reclamó una compensación de no menos de $500,000.00, la duplicación de los daños conforme a las leyes invocadas, la reinstalación en su empleo, el pago de salarios y beneficios dejados de percibir, lucro cesante, costas, gastos y honorarios de abogado.

Así las cosas, el 19 de agosto de 2022, el señor Soto, su esposa, la señora Rivera, y la Sociedad Legal de Gananciales compuesta por ambos, presentaron una *Moción en Solicitud de Desestimación de la Querella* [...].[2] En esta solicitaron la desestimación de la *Querella* en cuanto a las reclamaciones presentadas contra ellos en su carácter personal y contra la Sociedad Legal de Gananciales, por entender que dicha acción era improcedente en derecho. Sostuvieron que, independientemente de las defensas que pudiera levantar posteriormente el Municipio de Adjuntas respecto a los hechos

---

[2] *Véase*, Entrada Núm. 11, SUMAC TPI.

alegados en la *Querella*, no procedía mantener como demandados al alcalde en su carácter personal ni a la Sociedad Legal de Gananciales.

En apoyo de su planteamiento, invocaron la decisión del Tribunal Supremo de Puerto Rico en *Santiago Nieves v. Braulio Agosto Motors*, 197 DPR 369 (2017), en la cual se resolvió que la Ley Núm. 115, *supra*, no imponía responsabilidad personal a los agentes o representantes de un patrono por reclamaciones de represalias. Según expusieron, en el referido caso, el Tribunal Supremo concluyó que la inclusión de los agentes dentro de la definición de "patrono" tuvo el propósito de responsabilizar vicariamente al patrono por las actuaciones de sus agentes y no de imponer responsabilidad personal a estos. Añadieron que la referida ley no contenía disposición alguna que evidenciara una intención legislativa de responsabilizar individualmente a los agentes del patrono.

Asimismo, señalaron que el Tribunal Supremo expresó que, como norma general, cuando una conducta patronal estaba regulada y sancionada por una legislación laboral especial, el empleado debía limitarse a los remedios provistos por dicha legislación y no podía recurrir al Art. 1802 del Código Civil de 1930, 31 LPRA sec. 5141, salvo que se alegara una conducta torticera independiente. Indicaron que, en *Santiago Nieves v. Braulio Agosto Motors, Inc.*, supra, se concluyó que no se había alegado una actuación torticera independiente al despido que justificara una reclamación separada contra los agentes del patrono.

En vista de lo anterior, sostuvieron que, en el presente caso, el Municipio de Adjuntas era el patrono para fines de la Ley Núm. 115, *supra*, y que el alcalde, en su función de autoridad nominadora, actuaba en representación del Municipio. Por ello, argumentaron que cualquier actuación atribuida al alcalde en el ejercicio de sus funciones administrativas incidía sobre el Municipio de Adjuntas y no generaba responsabilidad personal bajo dicha legislación. Añadieron que, aun cuando se alegara un despido en represalia, los remedios disponibles

serían únicamente aquellos provistos por la Ley Núm. 115, *supra,* contra el Municipio, sin que procediera una reclamación contra funcionarios, supervisores, agentes o la sociedad legal de gananciales.

También argumentaron que la Ley Núm. 80 de 30 de mayo de 1976, según enmendada, conocida como *Ley sobre Despidos Justificados*, 29 LPRA sec. 185a, *et seq.* (Ley Núm. 80), no aplicaba a los empleados públicos, pues sus disposiciones no fueron extendidas al sector gubernamental. Expusieron que los empleados públicos contaban con las protecciones derivadas del principio de mérito y que la Ley Núm. 115*, supra,* únicamente incorporó una enmienda relacionada con represalias, sin extender al sector público los remedios de la Ley Núm. 80, *supra.*

En cuanto a la alegación de discrimen por condición de salud, señalaron que el apelante alegó haber sido despedido luego de ausentarse por haber contraído COVID-19, en supuesta violación de la legislación ADA federal y estatal. En respuesta, expusieron el propósito y alcance de la Ley ADA y de la legislación estatal sobre discrimen por impedimentos, destacando que ambas prohibían discriminar contra personas cualificadas con impedimentos en distintos aspectos de la relación laboral. No obstante, afirmaron que del expediente del apelante no surgía documentación alguna que evidenciara impedimentos o condiciones que activaran las protecciones de dichas leyes ni elementos que sugirieran que su despido obedeciera a la alegada condición de salud. Además, sostuvieron que prácticamente todos los empleados del Municipio, incluyendo al alcalde, habían contraído COVID-19 y se habían ausentado conforme a los protocolos aplicables, sin que ello hubiese provocado despidos o afectaciones a sus empleos.

Finalmente, puntualizaron que de una lectura de la *Querella* surgía que las alegaciones se referían exclusivamente a actuaciones administrativas relacionadas con la figura del alcalde como autoridad nominadora y que no se alegaban actos torticeros independientes que

sustentaran una causa de acción al amparo del Artículo 1802 del Código Civil, *supra*. Por ello, solicitaron que se declarara Ha Lugar la moción y se desestimaran las reclamaciones presentadas contra el alcalde en su carácter personal, contra su esposa y contra la Sociedad Legal de Gananciales.

Por su parte, el 24 de agosto de 2022, el Municipio de Adjuntas presentó su *Contestación a Demanda*.[3] En primer lugar, señaló que las alegaciones formuladas por el apelante eran ambiguas y no identificaban con precisión la legislación federal o estatal en que se fundamentaban las causas de acción, por lo que respondió a las alegaciones tomando en consideración la legislación que entendió aplicable a los hechos alegados.

Particularmente, admitió ciertos hechos relacionados con la identidad del señor Negrón, la radicación de la *Querella* bajo la Ley Núm. 2, la fecha de su primer nombramiento el 2 de marzo de 2015, su puesto de guardián, su salario de $7.25 por hora y la acumulación de licencias de vacaciones, enfermedad y bono de Navidad. Sin embargo, negó que el apelante fuera un empleado por tiempo indeterminado y sostuvo que siempre fue un empleado transitorio del Municipio. Alegó que, el puesto ocupado por el apelante era uno transitorio con fecha fija de terminación y sin expectativa de retención.

Además, negó que el señor Negrón desempeñara las funciones descritas en la *Querella* y sostuvo que este únicamente realizaba labores de vigilancia. Asimismo, negó que el puesto de guardián constituyera una posición esencial, alegando que el Municipio contaba con una Policía Municipal encargada de brindar seguridad. También negó que el apelante gozara de una trayectoria laboral intachable, alegando que abandonaba las áreas asignadas, generaba situaciones hostiles en Recursos Humanos cuando se le asignaban otras áreas u horarios y que recibió varias amonestaciones por abandonar su área de trabajo.

---

[3] *Véase*, Entrada Núm. 11, SUMAC TPI.

En cuanto a las alegaciones de discrimen político, negó que el señor Soto conociera la afiliación política del señor Negrón o de su familia y rechazó la alegación de que dicha afiliación fuera conocida en el pueblo de Adjuntas. Igualmente, negó que el apelante tuviera derecho a una plaza permanente o que existiera obligación legal alguna de nombrarlo a una plaza de carrera.

Respecto a la terminación de la relación laboral, negó que el apelante hubiese sido despedido. Alegó que, el 31 de enero de 2022, el señor Negrón fue cesanteado debido a la expiración de su nombramiento transitorio. También negó varias alegaciones relacionadas con la duración de su empleo y la jornada laboral reclamada por el apelante, señalando que el anterior alcalde había aumentado ilegalmente las horas de trabajo de empleados transitorios durante el periodo de veda electoral y que dicha transacción era nula.

Por otra parte, negó las alegaciones de discrimen político, discrimen por condición de salud, represalias, hostigamiento, cambios indebidos en las condiciones de empleo, daños emocionales y demás actos imputados por el apelante. Asimismo, negó las alegaciones relacionadas con los daños reclamados y cuestionó las cuantías solicitadas.

Como defensas afirmativas, sostuvo que la *Querella* no exponía una reclamación que justificara la concesión de remedio alguno; que los daños alegados, de existir, fueron causados por la propia conducta del apelante o por terceros; que no existía relación causal entre los daños reclamados y las actuaciones imputadas al Municipio; y que la acción era temeraria y frívola. También alegó que las cuantías reclamadas eran exageradas, desproporcionadas e improcedentes.

Específicamente, en relación con las reclamaciones al amparo de la Ley ADA federal y la Ley Núm. 44 de 2 de julio de 1985, según enmendada, conocida como *Ley para Prohibir el Discrimen Contra las Personas con Impedimentos Físicos, Mentales o Sensoriales*, 1 LPRA sec. 501, *et seq.* (Ley Núm. 44) sostuvo que el apelante no alegó ni demostró

padecer una condición incapacitante que activara las protecciones de dichas leyes. Alegó que el contagio de COVID-19 no establecía, por sí solo, un nexo causal con la cesantía alegada y que, al enterarse del contagio, el Municipio implementó los protocolos correspondientes, reconoció el periodo de cuarentena y pagó los días de enfermedad. Además, sostuvo que el señor Negrón no agotó el remedio administrativo ante la *Equal Employment Opportunity Commission* (EEOC) para sostener una reclamación bajo la ADA federal. Añadió que el apelante no solicitó acomodo razonable alguno, que no era una persona con discapacidad según los criterios de la ADA y que ni el Municipio ni el alcalde tenían conocimiento de alguna condición incapacitante. También sostuvo que el apelante no cumplía con los requisitos jurisprudenciales para establecer una reclamación válida bajo la Ley ADA Federal ni bajo la Ley Núm. 44, *supra.*

En cuanto al alegado discrimen político, el Municipio sostuvo que el señor Negrón no cumplía con los requisitos necesarios para establecer un caso *prima facie*, particularmente porque no fue despedido sino cesanteado por la expiración de su nombramiento transitorio. Además, alegó que el apelante no demostró que su afiliación política fuera un factor sustancial o motivante de la terminación de su empleo y que existían razones legítimas para la cesantía que no constituían discrimen político.

Respecto a la Ley Núm. 115, *supra,* sostuvo que el apelante no alegó ni demostró haber participado en alguna de las actividades protegidas por dicha ley, ni haber presentado una queja o participado en una investigación que activara sus protecciones. Por ello, argumentó que no cumplía con los elementos necesarios para establecer una reclamación por represalias.

Finalmente, el Municipio aseguró que el señor Negrón conocía que ocupaba un puesto transitorio sin expectativa de continuidad, que no tenía derecho a reinstalación ni a salarios dejados de percibir más allá del término de su nombramiento, y que tanto ellos y el señor Soto

actuaron en todo momento conforme a las facultades y funciones reconocidas por el Código Municipal de Puerto Rico. En consecuencia, solicitó que se declarara Ha Lugar su contestación y se desestimaran las reclamaciones presentadas en su contra.

Así las cosas, el 9 de septiembre de 2022, el apelante presentó varios escritos de desistimiento. En primer lugar, desistió con perjuicio de su reclamación al amparo de la Ley Núm. 115, *supra*, contra el señor Soto, tanto en su carácter personal como en representación de la Sociedad Legal de Gananciales compuesta junto a su esposa, la señora Rivera.[4] Asimismo, desistió con perjuicio de todas las reclamaciones presentadas bajo la Ley ADA federal contra todas las partes.[5] De igual forma, presentó un desistimiento sin perjuicio de las reclamaciones dirigidas contra la Sociedad Legal de Gananciales y la señora Rivera.[6]

Por otra parte, ese mismo día, a saber, el 9 de septiembre de 2022, el apelante también presentó una *Oposición a Desestimación* en respuesta de la solicitud de desestimación presentada por el señor Soto, su esposa, la señora Rivera, y la Sociedad Legal de Gananciales compuesta por ambos.[7] En primer lugar, señaló que, ciertos planteamientos de la solicitud de desestimación eran académicos debido a los desistimientos con perjuicio previamente presentados. No obstante, resaltó que de la propia moción de desestimación surgía una admisión de que una reclamación en daños y perjuicios al amparo del entonces Artículo 1802 del Código Civil, *supra*, hoy Artículo 1536 del Código Civil de Puerto Rico de 2020, podría ser procedente. Por ello, argumentó que su querella sí contenía una causa de acción en daños que justificaba mantener al alcalde en el pleito.

Asimismo, alegó que tanto las reclamaciones por discrimen político como las reclamaciones bajo la Ley ADA estatal permitían demandar a funcionarios en su carácter oficial y personal. Sostuvo que

---

[4] *Véase*, Entrada Núm. 26, SUMAC TPI.
[5] *Véase*, Entrada Núm. 27, SUMAC TPI.
[6] *Véase*, Entrada Núm. 28, SUMAC TPI.
[7] *Véase*, Entrada Núm. 29, SUMAC TPI.

no existía inmunidad que protegiera a funcionarios que incurrieran en actos de discrimen y argumentó que la Ley Núm. 44, *supra*, y la Ley Núm. 100 de junio de 1959, según enmendada, conocida como *Ley Antidiscrimen de Puerto Rico*, 29 LPRA sec. 146, *et seq.* (Ley Núm. 100) contemplaban responsabilidad de personas naturales por actos discriminatorios.

Por otra parte, expuso que la solicitud de desestimación se fundamentaba en la Regla 10.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 10.2, por alegadamente no exponerse una reclamación que justificara la concesión de un remedio. En oposición a ello, sostuvo que las reglas procesales únicamente exigían una relación sucinta y sencilla de los hechos que demostraran el derecho a un remedio y una solicitud de dicho remedio, sin requerir una exposición detallada de todos los hechos ni la presentación de documentos junto a la demanda. A esos fines, citó diversas disposiciones de las Reglas de Procedimiento Civil y jurisprudencia del Tribunal Supremo para sostener que las alegaciones debían interpretarse liberalmente a favor de la parte demandante y que su propósito principal era notificar adecuadamente a la parte adversa sobre las reclamaciones que debería enfrentar. Alegó que una Demanda cumplía con los requisitos procesales siempre que contuviera suficiente información para que la parte demandada comprendiera la naturaleza de las reclamaciones y pudiese formular su defensa.

De igual forma, afirmó que la demanda enmendada contenía alegaciones directas contra el alcalde en su carácter oficial y personal y señaló específicamente varios párrafos de la querella que, a su juicio, constituían imputaciones suficientes para sostener las reclamaciones. Argumentó que dichas alegaciones eran claras, sencillas y contenían el mínimo de detalle requerido para informar los actos que alegadamente causaron los daños reclamados.

Finalmente, sostuvo que la solicitud de desestimación pretendía eliminar las reclamaciones mediante tecnicismos legales planteados de

forma general y vaga. Alegó que la querella cumplía con los requisitos procesales aplicables y que, al evaluar una moción de desestimación, el Tribunal debía aceptar como ciertos los hechos bien alegados e interpretarlos de la manera más favorable a la parte demandante. En consecuencia, argumentó que no procedía la desestimación, ya que no se podía concluir con certeza que carecía de derecho a remedio bajo cualquier estado de hechos que pudiera probarse en apoyo de sus reclamaciones.

Posteriormente, tras varias mociones relacionadas con la procedencia del trámite sumario bajo la Ley Núm. 2, *supra*, el Tribunal determinó convertir el caso a un procedimiento ordinario en la vista celebrada el 9 de septiembre de 2022. La determinación fue formalizada mediante *Resolución* emitida el 10 de septiembre de 2022 y notificada el 13 de septiembre de 2022.[8]

El 12 de septiembre de 2022, a raíz de los desistimientos presentados, el TPI emitió una *Sentencia Parcial* que se notificó el 13 de septiembre de 2022, mediante la cual ordenó el archivo de las causas de acción contra las partes objeto de los desistimientos antes descritos.[9]

Luego de varios trámites procesales, el 23 de septiembre de 2022, el señor Soto presentó una *Moción de Desestimación Ampliada*.[10] Sostuvo que, tras las determinaciones previas del Tribunal, las únicas causas de acción que permanecían en su contra eran las relacionadas con la Ley Núm. 44, *supra*, la Ley Núm. 100, *supra*, y el alegado discrimen político. Alegó que la reclamación bajo la Ley Núm. 44, *supra*, era improcedente porque la única alegación específica de la querella relacionada con una condición de salud indicaba que el apelante había padecido COVID-19 antes de su despido. Planteó que, dicha enfermedad no estaba comprendida dentro de la definición de impedimento físico, mental o sensorial protegida por la Ley Núm. 44,

---

[8] *Véase*, Entrada Núm. 35, SUMAC TPI.
[9] *Véase*, Entrada Núm. 30, SUMAC TPI.
[10] *Véase*, Entrada Núm. 40, SUMAC TPI.

*supra.* Reiteró que numerosos empleados del Municipio, incluido él mismo, contrajeron la enfermedad sin que ello provocara despidos, y argumentó que ni la ley ni la jurisprudencia reconocían una causa de acción personal contra él bajo dicho estatuto.

Asimismo, sostuvo que la Ley Núm. 100, *supra*, tampoco proveía una causa de acción en su carácter personal por actuaciones realizadas de buena fe en el ejercicio de sus funciones como alcalde. Argumentó que los municipios no operaban como negocios o empresas privadas y citó jurisprudencia para sostener que la Ley Núm.100, *supra*, no era aplicable a los municipios.

Particularmente, en cuanto al reclamo por discrimen político, alegó que las aseveraciones de la querella eran demasiado generales y que no existía presunción alguna de discrimen político. Señaló que, aun interpretando liberalmente las alegaciones, de la propia querella surgía que, tras asumir el cargo en enero de 2021, continuó renovando mensualmente los nombramientos transitorios del apelante hasta enero de 2022. Afirmó que posteriormente decidió no renovar el contrato debido a alegados actos de abandono de trabajo, ausencias, insubordinación y una actitud desafiante hacia la administración municipal y la Directora de Recursos Humanos. También alegó que el señor Negrón no fue sustituido por otra persona en el puesto.

Específicamente, expuso que había extendido sucesivamente los nombramientos transitorios del apelante durante todo el año 2021 y hasta el 31 de enero de 2022, acompañando numerosos informes de cambio y la carta mediante la cual se notificó que el contrato no sería renovado. Expresó que, estos documentos demostraban que, luego del proceso electoral de 2020, el señor Negrón permaneció empleado por más de un año y que la decisión de no extender el nombramiento respondió a alegadas conductas hostiles, insubordinación, abandono de funciones y conflictos relacionados con el horario que el apelante deseaba mantener para poder operar simultáneamente su negocio de barbería.

Por otra parte, el señor Soto invocó la doctrina de inmunidad condicionada de los funcionarios públicos. Alegó que las decisiones impugnadas fueron tomadas en el ejercicio de funciones discrecionales y de buena fe, por lo que estaban protegidas por dicha inmunidad. Citó jurisprudencia sobre la protección conferida a los funcionarios públicos cuando actuaban razonablemente y sin malicia en el desempeño de sus funciones oficiales. También sostuvo que el apelante no presentó reclamación alguna al amparo de la Sección 1983 de la Ley Federal de Derechos Civiles, disposición que, según argumentó, sí contemplaba reclamaciones personales contra funcionarios que actuaban de mala fe. Afirmó que ello no ocurrió en este caso porque existían razones justificadas para no extender el contrato del apelante.

Por último, alegó que los Arts. 2.042 y 2.043 del Código Municipal parecían conferir jurisdicción exclusiva a la Comisión Apelativa del Servicio Público para atender reclamaciones como las formuladas por el apelante y señaló que éste nunca acudió a dicho foro administrativo. Por todo lo anterior, solicitó que se desestimara la querella presentada contra él en su carácter personal al sostener que las leyes invocadas no autorizaban una reclamación personal en su contra y que sus actuaciones estaban justificadas y protegidas por la inmunidad condicionada.

Así las cosas, el 21 de octubre de 2022, el señor Negrón presentó una *Querella y/o Demanda Enmendada*.[11] La enmienda a la demanda tuvo el efecto de eliminar las causas de acción previamente desistidas e incorporar nuevas alegaciones. En particular, el apelante alegó que, antes de la terminación de su empleo, había sometido al Municipio evidencia de que padecía condiciones pulmonares y que dicha información fue presentada para objetar los cambios en su área de trabajo por entender que estos afectaban su salud. Además, añadió la alegación de que la parte apelada incurrió en discrimen en su contra por razón de dichas condiciones pulmonares.

---

[11] *Véase*, Entrada Núm. 43, SUMAC TPI.

De igual forma, ese mismo día, a saber, el 21 de octubre de 2022, el apelante presentó una *Moción en Oposición a Desestimación* respondiendo al escrito de desestimación ampliada presentado por el señor Soto.[12] Alegó que, aunque en la demanda original se hizo referencia al COVID-19, las alegaciones no se limitaban exclusivamente a esa condición y podían comprender otras condiciones de salud. Añadió que presentó una demanda enmendada para aclarar que fue objeto de discrimen por una condición pulmonar grave conocida por el Municipio de Adjuntas y por el alcalde en su carácter personal a través de los expedientes y récords de personal. Sostuvo que la definición de impedimento contenida en la Ley Núm. 44, *supra*, era amplia y no establecía un catálogo específico de enfermedades, por lo que rechazó el planteamiento de que dicha ley no cobija la condición alegada. Asimismo, argumentó que la propia moción de desestimación reconocía que otros empleados habían padecido COVID-19 sin ser despedidos, lo que, según sostuvo, no justificaba la desestimación de su reclamación.

En cuanto a la reclamación por discrimen político, reiteró su alegación de que fue discriminado y despedido por haber participado en actividades relacionadas con el Partido Nuevo Progresista. Sostuvo que la mera participación en actividades políticas no constituía justa causa para despedir a un empleado público cuyas funciones no estaban relacionadas con la formulación de política pública ni requerían afiliación política. También planteó que las referencias hechas por la parte apelada a actuaciones de administraciones municipales anteriores no eran pertinentes para resolver una moción de desestimación.

Además, argumentó que las alegaciones de conducta hostil, insubordinación, ausencias y abandono de trabajo formuladas por la parte apelada constituían controversias de hechos que no podían resolverse mediante una moción de desestimación. Señaló que no obraban en el expediente amonestaciones, advertencias u otra

---

[12] *Véase*, Entrada Núm. 44, SUMAC TPI.

documentación que sustentara tales alegaciones y que los documentos acompañados a la moción consistían únicamente en contratos transitorios y documentos relacionados con su vigencia. También sostuvo que los planteamientos sobre su barbería y las razones alegadas para la terminación de su empleo eran asuntos fácticos que requerían descubrimiento de prueba y una evaluación en etapas posteriores del litigio, no en el contexto de una solicitud de desestimación.

Respecto a la Ley Núm. 100, *supra*, argumentó que sí existía una causa de acción contra funcionarios en su carácter personal, al sostener que la definición de patrono bajo dicha ley incluía responsabilidad personal. Añadió que existían mecanismos legales para la defensa de funcionarios públicos precisamente porque estos podían enfrentar reclamaciones de esa naturaleza.

Finalmente, invocó la norma jurisprudencial según la cual las alegaciones de una Demanda debían interpretarse liberalmente y de la manera más favorable a la parte demandante al evaluar una moción de desestimación. Sostuvo que la desestimación únicamente procedía cuando surgía con certeza que el demandante no tenía derecho a remedio alguno bajo ningún estado de hechos que pudiese probarse en apoyo de sus reclamaciones. Con base en ello, argumentó que la solicitud de desestimación ampliada presentada por el señor Soto debía declararse No Ha Lugar y que el caso debía continuar su curso.

El 31 de octubre de 2022, el señor Soto presentó una *Moción en Oposición a Petición de Permiso para Enmendar Querella* [...].[13] En síntesis, sostuvo que el apelante procuraba enmendar su reclamación a raíz de la *Moción de Desestimación Ampliada* presentada por él, la cual se encontraba pendiente de adjudicación ante el Tribunal. Alegó que en dicha moción había argumentado que el COVID-19 no constituía una enfermedad limitante conforme a la definición contenida en la Ley Núm. 44, *supra*, y que dicha legislación tampoco reconocía

---

[13] *Véase*, Entrada Núm. 45, SUMAC TPI.

una causa de acción que permitiera exigir responsabilidad personal al alcalde. Por ello, solicitó que el Tribunal resolviera primero las mociones pendientes a base de las alegaciones contenidas en la querella original.

Atendidos todos los escritos presentados por las partes, el 10 de noviembre de 2022, el TPI dictó una *Sentencia Parcial* que se notificó el 16 de noviembre de 2022.[14] En esta, realizó las siguientes determinaciones: (1) declaró Ha Lugar la solicitud para presentar la demanda enmendada presentada por el apelante; (2) determinó que el señor Negrón había actuado correctamente al presentar directamente una acción de daños y perjuicios por alegado discrimen en el empleo sin acudir previamente ante la Comisión Apelativa del Servicio Público (CASP); (3) declaró Ha Lugar la solicitud de desestimación de la causa de acción por discrimen político al amparo de la Ley Núm. 100, *supra*; y (4) mantuvo vigentes las restantes causas de acción, a saber, la reclamación por discrimen bajo la Ley Núm. 44, *supra*, y la acción de daños y perjuicios por alegado discrimen al amparo de dicha ley o como una causa de acción autónoma.

Así las cosas, el 9 de diciembre de 2022, el señor Soto presentó una *Moción Contestando Querella-Demanda Enmendada*.[15] En esencia, negó las alegaciones formuladas en la demanda enmendada y planteó varias defensas afirmativas. Entre estas, sostuvo que el apelante era un empleado transitorio contratado por un término fijo, cuyo nombramiento era revisado mensualmente; que el único documento existente en el expediente de empleo reflejaba que el señor Negrón había indicado padecer de asma, sin que hubiera solicitado acomodo razonable ni planteado condición pulmonar alguna ante la administración vigente o la anterior; y que no existía una causa de acción de carácter personal al amparo de la Ley Núm. 44, *supra*, ni una

---

[14] *Véase*, Entrada Núm. 50, SUMAC TPI.
[15] *Véase*, Entrada Núm. 55, SUMAC TPI.

relación causal entre los daños alegados y las actuaciones atribuidas al compareciente en su carácter personal.

Por su parte, el 22 de diciembre de 2022, el Municipio de Adjuntas presentó su *Contestación a la Demanda Enmendada*.[16] Allí negó las alegaciones esenciales de la reclamación y reiteró, en términos generales, los fundamentos previamente expuestos. No obstante, alegó, entre otras cosas, que el apelante el 28 de enero de 2022 presentó un documento en el que indicó padecer de asma bronquial y acompañó copia de un certificado médico; que dicho certificado no establecía que estuviera impedido de ejercer sus funciones de vigilante ni que requiriera acomodo razonable; que el apelante obtuvo un resultado positivo a COVID-19 el 4 de enero de 2022 y estuvo ausente de su empleo desde el 30 de diciembre de 2021 hasta el 4 de enero de 2022, notificando a la Directora de Recursos Humanos sobre dicha condición el 14 de enero de 2022.

Asimismo, el Municipio alegó que implementó la Orden Ejecutiva Núm. 4 Serie 2019-2020, mediante la cual se ordenó el cierre de operaciones municipales desde el 18 de marzo hasta el 3 de mayo de 2020, período durante el cual los empleados que no trabajaron, incluyendo al apelante, recibieron su salario sin descuentos a sus licencias. También sostuvo que, conforme a la Orden Ejecutiva Núm. 7 Serie 2019-2020, se dispuso una apertura parcial de operaciones a partir del 4 de mayo de 2020, y que los empleados no esenciales, incluido el apelante, continuaron recibiendo salario con cargo a sus licencias de vacaciones hasta el 15 de junio de 2020. Añadió que, posteriormente, al señor Negrón se le concedió una licencia de vacaciones regulares desde el 16 de junio hasta el 27 de julio de 2020. Además, sostuvo que, a todos los vigilantes, incluyendo al apelante, se les asignaron funciones de vigilancia en distintas dependencias municipales. Alegó que, tras la implementación de dicha instrucción,

---

[16] *Véase*, Entrada Núm. 57, SUMAC TPI.

el apelante fue el único empleado que mostró resistencia, desafío e insubordinación.

Más adelante, el 6 de marzo de 2023 se presentó el Informe para el Manejo de Caso.[17] Luego de surgir diversas controversias e incidentes relacionados con el descubrimiento de prueba, el TPI celebró vistas sobre el estado de los procedimientos los días 27 de marzo de 2023, 12 de febrero de 2024 y 7 de octubre de 2024. El descubrimiento de prueba concluyó el 12 de mayo de 2025.

Posteriormente, el 28 de mayo de 2025, el Municipio de Adjuntas presentó una *Moción Solicitando Permiso para Enmendar Contestación a la Demanda* respecto a aquellas alegaciones que originalmente había negado por falta de información y conocimiento.[18] Ese mismo día presentó la *Contestación Enmendada a la Demanda.*[19] Finalmente, el 2 de junio de 2025, el TPI emitió y notificó una *Orden* autorizando la referida enmienda.[20]

Por otra parte, el 7 de agosto de 2025, la parte apelada presentó una *Moción de Sentencia Sumaria.*[21] En primer lugar, expuso los hechos que, a su juicio, no estaban en controversia. Luego, conforme a los alegados hechos incontrovertidos, la prueba documental anejada y el derecho aplicable, solicitó que se dictara sentencia sumaria a su favor y se desestimaran todas las reclamaciones del apelante. En apoyo de su petición, sostuvo que, por tratarse de un empleado transitorio nombrado bajo la Ley de Municipios Autónomos, el apelante no tenía una expectativa legítima de retención en el empleo más allá del término de su nombramiento. Argumentó que los empleados transitorios no tenían derecho a permanencia, ni a la renovación automática de sus contratos, ni a la celebración de una vista administrativa una vez expirara el término de su nombramiento. Expresó que, la prueba documental y testifical demostraba que el apelante siempre ocupó un

---

[17] *Véase*, Entrada Núm. 75, SUMAC TPI.
[18] *Véase*, Entrada Núm. 155, SUMAC TPI.
[19] *Véase*, Entrada Núm. 156, SUMAC TPI.
[20] *Véase*, Entrada Núm. 158, SUMAC TPI.
[21] *Véase*, Entrada Núm. 166, SUMAC TPI.

puesto transitorio con nombramientos de duración fija renovados mensualmente.

En cuanto a la reclamación de discrimen político, *argumentó* que el señor Negrón no logró establecer los elementos necesarios para sostener dicha causa de acción. Alegó que el apelante no pudo demostrar que el alcalde conociera su afiliación política ni que esta hubiera sido un factor sustancial o motivador en la decisión de no renovar su nombramiento. Señaló que, contrario a las alegaciones de discrimen, el alcalde renovó el contrato del apelante en múltiples ocasiones luego de asumir el cargo, extendiéndole doce nombramientos consecutivos durante el año 2021. Además, sostuvo que las alegaciones del señor Negrón se basan únicamente en conjeturas derivadas de que él y el alcalde pertenecían a partidos políticos distintos.

Asimismo, argumentó que las reuniones, cambios de horario, reubicaciones y asignaciones de trabajo que el apelante identificó como actos de discrimen fueron medidas aplicadas a todos los vigilantes y respondieron a necesidades operacionales del municipio. Adujo que, el apelante fue el único empleado que objetó reiteradamente las reubicaciones y cambios de horario debido a su interés de mantener un horario compatible con su negocio de barbería. Añadió que el apelante recibió varias amonestaciones relacionadas con ausencias, incumplimientos de horario y otras situaciones laborales.

Alegó que, que la decisión de no renovar el nombramiento del apelante obedeció a la naturaleza transitoria del puesto y a consideraciones relacionadas con su desempeño y disponibilidad para el trabajo. Indicó que la decisión de no renovar el contrato había sido tomada antes de que el apelante presentara documentación relacionada con una alegada condición asmática. También señaló que el municipio no contrató otro vigilante transitorio para sustituir al apelante una vez venció su nombramiento.

Respecto a la reclamación bajo la Ley Núm. 44, *supra,* sostuvo que el apelante no demostró poseer un impedimento que lo cualificara

para la protección de dicha ley. Alegó que el Municipio desconocía la existencia de una condición incapacitante y que el apelante nunca solicitó acomodo razonable. Expresó que, no fue hasta el 26 de enero de 2022 que el apelante presentó una certificación médica indicando que padecía de asma bronquial, luego de objetar una reubicación al área del Motor Pool. Argumentó que la documentación médica presentada no demostraba que el señor Negrón tuviese un impedimento que limitara sustancialmente una actividad principal de la vida ni que cumpliera con los requisitos establecidos por la Ley ADA y la Ley Núm. 44, *supra.*

En cuanto al contagio de COVID-19, sostuvo que el municipio activó los protocolos correspondientes, reconoció el período de cuarentena y pagó los días correspondientes de enfermedad. Afirmó que el apelante no estableció una relación causal entre el contagio y la terminación de su empleo.

Sobre la reclamación de represalias al amparo de la Ley Núm. 115, *supra,* argumentó que el apelante no demostró haber ofrecido o intentado ofrecer información o testimonio ante un foro legislativo, administrativo o judicial. Sostuvo que la certificación médica relacionada con su condición asmática fue presentada únicamente a solicitud de la Directora de Recursos Humanos y no constituyó una querella ni una actividad protegida por la ley.

Finalmente, el señor Soto invocó la defensa de inmunidad condicionada. Alegó que actuó de buena fe y dentro del ámbito de sus funciones discrecionales como alcalde al decidir no renovar el contrato transitorio del demandante. Sostuvo que sus actuaciones estuvieron motivadas por la naturaleza transitoria del nombramiento y por situaciones relacionadas con la conducta y disponibilidad del apelante, y que ninguna de las leyes invocadas por este autoriza imponerle responsabilidad civil en su carácter personal. Por ello, solicitó la desestimación de todas las reclamaciones mediante sentencia sumaria.

El 15 de septiembre de 2025, el señor Negrón presentó una *Moción de Desestimación de Moción de Sentencia Sumaria.*[22] En síntesis, sostuvo que la solicitud de sentencia sumaria presentada por la parte apelada incumplía con los requisitos de la Regla 36 de Procedimiento Civil, *infra*, y que la mayoría de los hechos alegadamente incontrovertidos constituían opiniones o interpretaciones de los abogados respecto a lo que entendían que el demandante expresó durante su deposición.

En respuesta, la parte apelada presentó una *Réplica Moción de Desestimación de Sentencia Sumaria.*[23] En esta, sostuvo que cada uno de los hechos propuestos como incontrovertidos estaban debidamente respaldado por las deposiciones del apelante, de la Directora de Recursos Humanos, la Sra. Limary Berríos, y del alcalde, el señor Soto, así como por los documentos identificados como *exhibits*. Además, argumentó que la moción presentada por el apelante tenía como único propósito dilatar los procedimientos y obtener tiempo adicional para oponerse a la solicitud de sentencia sumaria, mediante el fraccionamiento de planteamientos que debieron haberse incluido en su oposición a dicha moción.

Así las cosas, el 23 de septiembre de 2025, el TPI emitió una *Orden* que se notificó el 24 de septiembre de 2025, concediéndole al señor Negrón hasta el 8 de octubre de 2025 para presentar su oposición a la solicitud de sentencia sumaria o, en la alternativa, informar si interesaba que la moción de desestimación previamente presentada fuese considerada como su oposición a dicha solicitud. El Tribunal advirtió que, de no comparecer dentro del término concedido, la moción presentada por el apelante sería considerada como su oposición a la sentencia sumaria y el asunto quedaría sometido para adjudicación.

Tras varios trámites procesales, el 27 de octubre de 2025, el señor Negrón presentó su *Oposición a Sentencia Sumaria y Solicitud de*

---

[22] *Véase*, Entrada Núm. 171, SUMAC TPI.
[23] *Véase*, Entrada Núm. 173, SUMAC TPI.

*Sentencia Sumaria a Favor de Querellante.*[24] En esta, sostuvo que en el presente caso existían controversias genuinas de hechos materiales que impedían la disposición sumaria del pleito. En particular, alegó que el señor Soto no examinó su expediente laboral antes de tomar la determinación de destituirlo; que la terminación de su empleo no respondió al vencimiento de su nombramiento; que nunca fue objeto de medidas disciplinarias, advertencias o señalamientos por conducta grave; y que completó satisfactoriamente su período probatorio. Asimismo, expresó que no existían limitaciones económicas que justificaran su separación del puesto, que fue el único empleado destituido y que las actuaciones de los apelados le generaron una expectativa de continuidad en el empleo.

Con relación a su causa de acción bajo la Ley Núm. 115, *supra*, planteó que la evidencia demostraba la existencia de represalias por parte de los apelados. Manifestó que realizó diversas reclamaciones relacionadas con sus derechos laborales ante la oficina de Recursos Humanos y ante el señor Soto, actividades que consideraba protegidas por dicho estatuto. A su juicio, la destitución respondió a dichas reclamaciones y no a razones legítimas relacionadas con su desempeño o conducta. Además, destacó que la protección provista por la Ley Núm. 115, *supra*, se extendía a los empleados municipales y que sus disposiciones debían interpretarse liberalmente a favor del trabajador.

Por otro lado, invocó la protección de la Ley Núm. 44, *supra*, y sostuvo que las disposiciones de dicho estatuto resultaban aplicables a los municipios y demás entidades gubernamentales comprendidas en la definición de patrono contenida en la ley. A esos fines, expuso el marco normativo y jurisprudencial relacionado con la prohibición del discrimen por razón de impedimento y los remedios disponibles cuando se demuestra una violación a sus disposiciones.

Asimismo, argumentó que su destitución constituía una acción adversa que configuraba un caso *prima facie* de represalias y/o

---

[24] *Véase*, Entrada Núm. 177, SUMAC TPI.

discrimen. Señaló que ocupaba un puesto transitorio por un año y que, bajo la nueva administración municipal, la duración de su nombramiento fue reducida a renovaciones mensuales. Añadió que, posteriormente, otros vigilantes recibieron nombramientos de carrera, mientras que él fue el único empleado separado antes de la implantación de dicha política. De igual forma, sostuvo que no existía impedimento alguno para la renovación de su nombramiento y que la evidencia apuntaba a que la decisión de separarlo respondió a motivos discriminatorios o represalias.

Finalmente, enfatizó que la legislación laboral debía interpretarse liberalmente a favor del trabajador y sostuvo que la prueba presentada demostraba la existencia de controversias reales sobre hechos materiales relacionadas con las razones de su destitución, la alegada conducta represiva y discriminatoria de los apelados y su expectativa de continuidad en el empleo. Por ello, concluyó que el caso requería la celebración de un juicio en sus méritos y solicitó que se declarara No Ha Lugar la solicitud de sentencia sumaria presentada por la parte apelada y Ha Lugar su solicitud de sentencia sumaria.

El 26 de noviembre de 2025, la parte apelada presentó una *Dúplica a Oposición a Mocion de Sentencia Sumaria.*[25] Evaluadas las posturas de ambas partes, el 2 de abril de 2026, el TPI emitió y notificó una *Sentencia.*[26] En primer lugar, realizó las siguientes determinaciones de hechos:

> 1. El demandante Roberto Carlos Negrón Miró tiene una barbería que se llama Robert Master Cuts y tiene patente municipal. (Exhibit 25 #166 SUMAC).
>
> 2. El demandante Roberto Carlos Negrón Miró trabaja solo como barbero desde el 2017 de lunes a sábado de 8:00 am a 6:00 pm. (Pág. 30, L. 5-20 del Anejo 1 #166 SUMAC).
>
> 3. El demandante Roberto Carlos Negrón Miró comenzó a trabajar en el Municipio de Adjuntas desde marzo de 2015. (Pág. 35, L. 5 del Anejo 1 #166 SUMAC).
> 4. En el 2015 el exalcalde Jaime Barlucea perteneciente al Partido Nuevo Progresista visitó la casa del demandante y

[25] *Véase*, Entrada Núm. 187, SUMAC TPI.
[26] *Véase*, Entrada Núm. 189, SUMAC TPI.

le ofreció el empleo de vigilante. (Pág. 35, L. 6-9 y Págs. 39-40 del Anejo 1 #166 SUMAC).

5. El demandante no se enteró del empleo por anuncio en el periódico o en las dependencias municipales. (Pág. 41, L. 5-10 del Anejo 1 #166 SUMAC).

6. El demandante no compitió con nadie para el puesto de vigilante. (Pág. 41, L. 17-24 del Anejo 1 #166 SUMAC).

7. En el 2015 el demandante trabajaba 4 horas de 5:00 pm. a 9:00 pm. y de 6:00 pm. a 10:00 pm. en su empleo de vigilante en la pista atlética del Municipio de Adjuntas. (Pág. 43, L. 6-15 del Anejo 1 #166 SUMAC).

8. El 17 de febrero de 2022 el demandante escribe documento dirigido a la Sra. Limary Berríos, Directora de Recursos Humanos para solicitar su expediente de trabajo. (Exhibit 1 #166 SUMAC y Págs. 45-46, L. 6-15 del Anejo 1 #166 SUMAC).

9. El 10 de marzo de 2022 el demandante recibió los documentos solicitados del expediente de trabajo. (Exhibits 2 y 3 #166 SUMAC y Pág. 47, L. 1-21 del Anejo 1 #166 SUMAC).

10. El primer nombramiento del demandante fue a un puesto transitorio de guardián del 2 de marzo de 2015 y expiró el 31 de agosto de 2015. (Exhibit 4 #166 SUMAC y Pág. 59, L. 20-25 y Pág. 60, L. 1-8 del Anejo 1 #166 SUMAC).

11. Cuando se firmó el Contrato de Empleo Transitorio del demandante con el Municipio de Adjuntas el 2 de marzo de 2015 se le entregó al demandante Documento de Funciones y Deberes del puesto del 6 de marzo de 2015. (Exhibit 5 #166 SUMAC).

12. El demandante aceptó que antes de firmar el documento del nombramiento inicial leyó que decía que era un nombramiento transitorio en un puesto de duración fija y que no le otorga el derecho a ser nombrado en un puesto en el servicio de carrera. (Pág. 60, L. 9-24; Pág. 61, L. 1-12; Pág. 62, L. 6-10 del Anejo 1 #166 SUMAC).

13. El demandante admitió que al momento de firmar le notificaron que su nombramiento es transitorio. (Pág. 62, L. 6-10 del Anejo 1 #166 SUMAC).

14. El demandante Negrón Miró como empleado gozaba de sus licencias de enfermedad y vacaciones, y tenía derecho al bono de navidad. (Pág. 151 del Anejo 4 #177 SUMAC).

15. Las funciones del empleo del demandante eran vigilar, sobreguardar (sic) las áreas y hacer que las personas siguieran las reglas del lugar. (Pág. 63, L. 7-22 y del Anejo 1 y Exhibit 5 #166 SUMAC).

16. El nombramiento transitorio del demandante tenía funciones permanentes y estaba escrito en el plan de clasificación. (Pág. 53, L. 721-727 del Anejo 4 #177 SUMAC).

17. El demandante nunca fue funcionario de Colegio ni tampoco ha sido Presidente de Barrio ni Corredor (ir a buscar la gente para votar). (Pág. 71, L. 19-23 y Pág. 72, L. 1-14 del Anejo 1 #166 SUMAC).

18. El exalcalde Jaime Barlucea, efectivo el 16 de noviembre de 2020, le aumentó las horas al demandante de 4 a 6 horas para un total de 30 horas semanales. (Exhibit 7 y Pág. 79, L. 1-18 del Anejo 1 #166 SUMAC).

19. El exalcalde Jaime Barlucea, efectivo el 16 de noviembre de 2020, también le aumentó el sueldo al demandante de $630.76 a $942.50. (Exhibit 7 #166 SUMAC).

20. El alcalde Soto Rivera le honró al demandante el aumento de horas de empleo y salario. (Exhibit 8 #166 SUMAC).

21. El alcalde José Hiram Soto Rivera, recién electo, le extendió al demandante un nombramiento efectivo el 12 de enero de 2021 al 31 de enero de 2021. (Exhibits 8 y 24; Pág. 82, L. 5-24 y Pág. 83, L. 1-9 del Anejo 1 #166 SUMAC).

22. El alcalde Soto Rivera siguió nombrando al demandante Roberto Carlos Negrón Miró mes a mes hasta enero de 2022 y también le reconoció las 30 horas semanales. (Exhibit 9; Pág. 83, L. 10-25; Pág. 84, L. 1-6 del Anejo 1 y Pág. 237 del Anejo 2 #166 SUMAC).

23. En específico, el alcalde Soto Rivera le extendió el nombramiento transitorio del: 1 de febrero de 2021 hasta el 28 de febrero de 2021; 1 de marzo de 2021 hasta el 31 de marzo de 2021; 1 de abril de 2021 hasta el 30 de abril de 2021; 1 de mayo de 2021 hasta el 31 de mayo de 2021; 1 de junio de 2021 hasta el 30 de junio de 2021; 1 de julio de 2021 hasta el 31 de julio de 2021; 1 de agosto de 2021 hasta el 31 de agosto de 2021; 1 de octubre de 2021 hasta el 31 de octubre de 2021; 1 de noviembre de 2021 hasta el 30 de noviembre de 2021; 1 de diciembre de 2021 hasta el 31 de diciembre de 2021; 1 de enero de 2022 hasta el 31 de enero de 2022. (Exhibit 9 y Págs. 85-88 del Anejo 1 #166 SUMAC).

24. El demandante trabajó en el mismo puesto de vigilante bajo las funciones y deberes del Documento de Funciones y Deberes del puesto del 6 de marzo de 2015 hasta que el alcalde, José Hiram Soto Rivera lo cesanteara de su empleo el 31 de enero de año 2022 sin interrupción. (Exhibit 5 #166 SUMAC; Anejo 1 #177 SUMAC; Pág. 88 del Anejo 1 #166 SUMAC; Pág. 88 del Anejo 2 #177 SUMAC; Pág. 34 inciso 58 #177 SUMAC y Pág. 19 #187 SUMAC).

25. En septiembre de 2021 la Directora de Recursos Humanos, Limary Berríos le cambio el área de trabajo de la Pista Atlética al Terminal de Carros Públicos y el Castillo con un horario de 5:00 – 11:00 pm. (Exhibit 10; Pág. 89, L. 8-19 y Pág. 90 del Anejo 1 #166 SUMAC).

26. Cuando el demandante Negrón Miró recibió el cambio de área y el horario de trabajo de septiembre de 2021 se comunicó con la Sra. Berríos porque ese horario le

afectaba grandemente ya que lo iba a poner en una situación que podía incumplir con el municipio y con su negocio de barbería. (Pág. 92 del Anejo 1 #166 SUMAC).

27. El demandante solicitó que le permitieran entrar a las 7:00 p.m. a la Directora de Recursos Humanos, Sra. Berríos. (Pág. 92 del Anejo 1 #166 SUMAC).

28. El 8 de noviembre de 2021 la Directora de Recursos Humanos Sra. Berríos mediante carta del 8 de noviembre de 2021 lo designa en la Plaza Pública para vigilar los arreglos navideños desde el 10 de noviembre de 2021 hasta el 29 de enero de 2022. (Exhibit 12, Pág. 195, L. 2818-2822 y Pág. 196 del Anejo 2 #166 SUMAC).

29. En noviembre de 2021 cuando el demandante comenzó a trabajar en la Plaza la Directora de Recursos Humanos Sra. Berríos le hizo el cambio de horario a petición del demandante para comenzar a las 7:00 pm-1:00 am y 1:00 am-7:00 am ya que el horario original era de 5:00 pm-11:00 pm y 11:00 pm-5:00 am. (Exhibit 12; Pág. 95 L. 7-11; Pág. 111, L. 1-25 del Anejo 1 y Pág. 198 del Anejo 2 #166 SUMAC).

30. Al cambiarle el horario al demandante, tuvo que también cambiarle el horario a los otros tres vigilantes para que no confligiera con el horario de trabajo del demandante en la barbería. (Pág. 199 del Anejo 2 #166 SUMAC).

31. El demandante Roberto Negrón Miró reconoce que los cambios de lugar de trabajo eran para áreas de instalaciones municipales para vigilar que era uno de sus deberes como vigilante. (Pág. 95 L. 17-25 y P. 96 del Anejo 1 #166 SUMAC).

32. El último horario del demandante Roberto Negrón Miró en el área de la pista atlética era de 8:00 pm a 2:00 am que no confligía con su negocio de barbería. (Pág. 99, L. 7-24 del Anejo 1 #166 SUMAC).

33. Además, del demandante Roberto Negrón Miró había otros cuatro empleados que hacían el mismo trabajo y también rotaban entre el castillo, el terminal de carros públicos y en la plaza. (Pág. 100, L. 11-25; Pág. 101 y Pág. 102, L. 1-4 del Anejo 1 #166 SUMAC).

34. De los 4 vigilantes el único que se quejó por su horario fue el demandante Roberto Negrón. (Pág. 197 del Anejo 2 #166 SUMAC).

35. El nombramiento del demandante Roberto Negrón Miró y su salario no se vieron afectados cuando se le envió a otras instalaciones municipales a prestar vigilancias entre septiembre a noviembre de 2021. (Pág. 104 del Anejo 1 #166 SUMAC).

36. El demandante Roberto Negrón Miró fue amonestado de forma verbal y escrita por no notificar enfermedad en el momento y amonestación escrita por no registrar ponche. (Exhibit 13 y Exhibit 16 #166 SUMAC).

37. El demandante Roberto Negrón Miró participaba en un programa de radio con el exalcalde Jaime Barlucea para informar al pueblo de Adjuntas sobre las actividades que

estaría realizando el gobierno municipal. (Pág. 139 del Anejo 1 #166 SUMAC).

38. El alcalde Soto Rivera ha vivido en Adjuntas toda su vida, pero cuando era soltero era vecino del demandante Roberto Negrón Miró y lo conoció de pequeño porque vivían en la misma calle. El alcalde tiene 57 años y el demandante 42 por lo que se llevan 15 años. (Pág. 141 y Pág. 142, L. 1-3 del Anejo 1; Pág. 5, L. 15-26; Pág. 11, L. 10-12 y Pág. 32, L. 1-3 del Anejo 3 #166 SUMAC).

39. El demandante Negrón Miró es soltero, nació el 21 de noviembre de 1981 y el alcalde Soto Rivera se independizó del 1990 al 1992 por lo que el demandante tenía entre 9 y 11 años cuando el alcalde se mudó del sector. (Pág. 115, L. 9-13 del Anejo 1 y Pág. 31, L. 20-27 del Anejo 3 #166 SUMAC).

40. Por tanto, cuando el demandante tenía 3 años, el alcalde Soto Rivera tenía 18 años. (Pág. 141 del Anejo 1 #166 SUMAC).

41. El demandante iba a las caravanas y actividades del PNP, pero no vio al alcalde Soto en ellas. (Pág. 146, L. 1-12 del Anejo 1 #166 SUMAC).

42. El demandante en el momento de ejercer el voto, él único que sabe por el partido que vota es él mismo porque el que se encierra en la urna es él. (Pág. 146, L. 17-23 del Anejo 1 #166 SUMAC).

43. El demandante Negrón Miró aceptó que el alcalde Soto Rivera no sabe por quien el vota. (Pág. 147, L. 6-9 del Anejo 1 #166 SUMAC).

44. El demandante Negrón Miró acepta que el alcalde Jaime Barlucea no lo nombró a un puesto permanente. (Pág. 151 del Anejo 1 #166 SUMAC).

45. El demandante aceptó que su nombramiento lo que decía era de mes a mes. (Pág. 159, L. 11-21 del Anejo 1 #166 SUMAC).
46. En febrero de 2021 se llevó a cabo una reunión para conocer a los vigilantes del municipio y el alcalde Soto Rivera se dirigió a todos los vigilantes diciendo que él pasaba por las áreas y que no encontraba a los empleados. Acto seguido, el demandante le dijo que él siempre estaba en su área. (Pág. 160, L. 10-23; Pág. 161; Pág. 162 y Pág. 169, L. 10-17 del Anejo 1 y Pág. 17 del Anejo 3 #166 SUMAC).

47. En esa reunión de febrero de 2021 solo habían de cuatro (4) a cinco (5) empleados del municipio. (Pág. 19, L. 5-9 del Anejo 3 #166 SUMAC y Pág. 21 #187 SUMAC).

48. En esa reunión el demandante se sintió mal y humillado. (Pág. 162 del Anejo 1 #166 SUMAC).

49. El Sr. Soto Rivera al comenzar como alcalde mandó a los guardias municipales a hacer funciones del demandante. (Pág. 175, L. 1-16 del Anejo 1 #166 SUMAC).

50. El demandante Roberto Negrón llevó una certificación de asma el 26 de enero de 2022, asume que el alcalde debe

saber su condición de salud, pero admite que él no vio al alcalde Soto Rivera examinar su expediente. (Exhibit 17; Pág. 193, L. 1-16 y Pág. 194, L. 1-19 del Anejo 1 #166 SUMAC).

51. La certificación médica del demandante es del Dr. Edwin Cuevas Zanabria, quién ha sido su doctor desde que era un niño. (Pág. 207, L. 3-25 del Anejo 1 #166 SUMAC).

52. El demandante cuando regresa al Municipio en enero de 2022, después de haber estado ausente por enfermedad debido a que tuvo COVID, va a conocer su horario de trabajo. (Pág. 195, L. 13-25 y Pág. 199, L. 13-25 del Anejo 1 #166 SUMAC).

53. El demandante Roberto Negrón le mencionó al Municipio su condición de asma cuando hubo cambio de área de trabajo al Motor Pool y cuando se le pidió una certificación el demandante fue a conseguirla. (Pág. 206, L. 23; Pág. 210, L. 18; Pág. 207, L. 1-2 y Pág. 210, L. 15-24 del Anejo 1 #166 SUMAC).

54. La Directora de Recursos Humanos Limary Berríos le solicitó al demandante que hiciera el reclamo de su condición de salud de asma por escrito. El demandante le entregó el escrito y la directora le pidió una certificación médica. (Pág. 203, L. 4-24 del Anejo 1 #166 SUMAC).

55. El demandante llevó la certificación médica, pero no solicitó un acomodo razonable. (Pág. 82 y Pág. 83, L. 1157-1165 del Anejo 2 #166 SUMAC).

56. La Directora de Recursos Humanos Limary Berríos indicó que el documento médico que le solicitó al demandante no fue para concederle algún beneficio, sino para confirmar su alegación de asma. (Pág. 91 y Pág. 92 del Anejo 4 #177 SUMAC).

57. La certificación específica que: "El (la) paciente Roberto Negrón Miró de 40 años de edad, se encuentra bajo nuestro cuidado médico. Paciente con historial de: Asma Bronquial. Agradeceré todas las consideraciones al respecto y su reconsideración en su situación de salud". (Exhibit 17 #166 SUMAC).

58. En el 2015 el demandante informó que era asmático, sin embargo, no consta certificación médica en el expediente laboral al respecto hasta enero de 2022. (Pág. 204, L. 4-20 del Anejo 1 y Pág. 223 del Anejo 2 #166 SUMAC).

59. El demandante solo llevó al Municipio la Certificación y no el resto del expediente médico. (Exhibits 18, 19, 20, 21, 22, 23 y Pág. 217, L. 1-25 del Anejo 1 #166 SUMAC).

60. El demandante no conoce el nombre de su neumólogo y cree que murió. (Pág. 212, L. 1-11 del Anejo 1 #166 SUMAC).

61. El demandante Roberto Negrón dice que su condición de asma se la atiende en su casa y no ha ido un neumólogo en los últimos 10 años. (Pág. 229, L. 1-15 del Anejo 1 #166 SUMAC).

62. La Sra. Limary Berríos Irizarry es Directora de Recursos Humanos desde el 1 de junio de 2021. (Pág. 17, L. 187-195 del Anejo 2 #166 SUMAC).

63. La Sra. Limary Berríos Irizarry no tiene estudios formales en Recursos Humanos, pero trabajó como Directora Administrativa y Directora Académica del Faro Christian Academy, por lo cual trabajaba con el personal educativo y no docente, y tenía adiestramientos en el área de recursos humanos. (Pág. 18, L. 204-211 y Pág. 19, L. 212-221 del Anejo 4 #177 SUMAC).

64. La Sra. Limary Berríos Irizarry tiene la función de asesorar en todo lo que tiene ver con Recursos Humanos, planificar talleres del personal, supervisar la Oficina de Recursos Humanos, velar por el presupuesto para el pago de salario a los empleados y rendir informes mensuales de ética y al contralor, y hacer cumplir las políticas públicas del Municipio. (Pág. 24, L. 297-299; Pág. 25 y Pág. 26, L. 317-319 del Anejo 2 #166 SUMAC).

65. La Sra. Berríos también establece los horarios de empleo de los empleados del Municipio de Adjuntas. (Pág. 74, L. 1029-1034 del Anejo 2 #166 SUMAC).

66. El empleo del demandante Roberto Negrón Miró con el Municipio de Adjuntas es de empelado transitorio. (Pág. 36, L. 478-479; Pág. 37, L. 480-483 del Anejo 2 #166 SUMAC).

67. La Sra. Berríos Irizarry explicó en la deposición que la diferencia entre un empleado transitorio y uno de carrera es que el transitorio se renueva mes a mes y no tiene expectativa de permanencia y el de carrera pasa por un proceso de competencia y se le otorga la plaza. (Pág. 37, L. 484-495 y Pág. 38, L. 496-502 del Anejo 2 #166 SUMAC).

68. En la oficina de la Sra. Berríos se tienen los expedientes personales de cada empleado del Municipio. Además, el acceso inmediato y custodio de los expedientes de los empleados del Municipio solo lo tiene la Sra. Berríos Irizarry, Directora de Recursos Humanos. (Pág. 29, L. 362-367; Pág. 31, L. 400- 404 y Pág. 32, L. 405-408 del Anejo 4 #177 SUMAC).

69. La Sra. Berríos Irizarry ha examinado en tres ocasiones el expediente de personal del Sr. Roberto Negrón Miró y del expediente de él no hay evaluaciones ni amonestaciones disciplinarias. (Pág. 47, L. 640-644; Pág. 48, L. 651-657 del Anejo 4; Pág. 129, L. 1849-1851 y Pág. 130, L. 1852-1856 del Anejo 3 #177 SUMAC).

70. Además, la Sra. Berríos Irizarry expresó que del expediente laboral del Sr. Negrón Miró no surge las razones por las cuales fue contratado en marzo de 2015. (Pág. 130, L. 1857-1866 del Anejo 3 #177 SUMAC).

71. La Sra. Berríos Irizarry también indica que del expediente laboral del demandante no surge documento sobre que fue orientado sobre el Reglamento en el momento de su nombramiento. (Pág. 177, L. 2540-2550 del Anejo 3 #177 SUMAC).

72. La Directora de Recursos Humanos Sra. Berríos indicó que todos los años a los empleados se les orienta de forma verbal y grupal a través del manual de empleado sobre cómo se solicita un acomodo razonable. (Pág. 54, L. 736-748 y Pág. 55, L. 749-758 del Anejo 2 #166 SUMAC).

73. En el municipio no hay un formulario específico para que un empleado pueda solicitar un acomodo razonable. (Pág. 160, L. 2286-2287 y Pág. 161, L. 2288-2291 del Anejo 3 #177 SUMAC).

74.Los empleados tienen que cumplir con veinte (20) horas de ética gubernamental que se habla sobre discrimen político, pero no hay un seminario independiente de acomodo razonable y discrimen político. (Pág. 62, L. 860-864; Pág. 63 y Pág. 64, L. 881-882 del Anejo 3 #177 SUMAC).

75. La Directora de Recursos Humanos Sra. Berríos no sabe donde reside el demandante Roberto Negrón Miró.

76. La Directora de Recursos Humanos Sra. Berríos expresó en la deposición que, en diciembre de 2021 se reúne con el alcalde Soto por situaciones que habían sucedido con el Sr. Negrón ante la negativa de cumplir con su horario de trabajo ya que el interés del Sr. Negrón era atender su barbería y para él esa era su prioridad. (Pág. 70, L. 974-980; Pág. 71, L. 981-995 y Pág. 72, L. 996-1003 del Anejo 2 #166 SUMAC).

77. La Sra. Berríos sabía desde diciembre de 2021 que el alcalde no le iba a renovar el nombramiento transitorio al Sr. Roberto Negrón. (Pág. 81, L. 1137-1143 del Anejo 2 #166 SUMAC).

78. La Sra. Berríos no advirtió verbalmente o por escrito al demandante sobre sus problemas con el horario laboral. (Pág. 181, L. 2604-2611; Pág. 182, L. 2612-2625 y Pág. 183, L. 2626-2640 del Anejo 3 #177 SUMAC).

79. El alcalde Soto Rivera es quien toma la decisión de no extenderle el nombramiento al demandante. (Pág. 66, L. 918-922 y Pág. 67, L. 924-937 del Anejo 2 y Pág. 49, L. 4-8 del Anejo 3 #166 SUMAC).

80. La Directora de Recursos Humanos Berríos Irizarry no recomendó despedir o no despedir, o sea renovarle el contrato al demandante. (Pág. 49, L. 9-14 del Anejo 3 #166 SUMAC y Pág. 49, L. 9-14 del Anejo 3 #177 SUMAC).

81. La razón por la cual se solicitó la certificación médica fue porque el demandante estaba solicitando una ubicación de su preferencia en la pista atlética ya que a los 4 empleados con clasificación de vigilantes se le iba a ubicar en el área de Obras Públicas y el Sr. Negrón no quería esa ubicación por su condición de asma. (Pág. 85, L. 11-1203; Pág. 86; Pág. 87; Pág. 88; Pág. 203 y Pág. 204, L. 2943-2944 del Anejo 2 #166 SUMAC).

82. La Sra. Limary Berríos le explicó al demandante que los vigilantes iban para una oficina ubicada al frente del área del Motor Pool. (Pág. 204 y 205 del Anejo 2 #166 SUMAC).

83. La oficina que se iba a reubicar al demandante Negrón Miró es un área amplia con oficina administrativa con baño, cocina, ponchador y aire acondicionado. (Pág. 205 del Anejo 2 #166 SUMAC).

84. El área que el demandante Negrón Miró alegó que había basura queda a más o menos 100 metros de las oficinas. (Pág. 206, L. 2973-2982 del Anejo 2 #166 SUMAC).

85. Según la Directora de Recursos Humanos Sra. Berríos el propósito de enviar a los 4 vigilantes al área de Obras Públicas fue para darle vigilancia a dicha área ya que entre los meses de agosto a julio de 2021 hubo un sabotaje en uno de los tanques de diésel que lo contaminaron con agua. (Pág. 94 y Pág. 95 del Anejo 2 y Pág. 36, L. 10-17 del Anejo 3 #166 SUMAC).

86. La Directora de Recursos Humanos Sra. Berríos estaba encargada de la restructuración para establecer mayor seguridad al área del motor pool. (Pág. 97, L. 1376-1387 del Anejo 2 #166 SUMAC).

87. Después del 31 de enero de 2022 no se contrataron puestos transitorios para vigilantes. (Pág. 107, L. 1528-1534 y Pág. 108, L. 1535 del Anejo 2 #166 SUMAC).

88. A la fecha que el alcalde Soto Rivera había entrado a la administración municipal hasta el 21 de junio de 2023 (fecha deposición Sra. Berríos) el municipio nunca había publicado ningún tipo de plaza de empleo. (Pág. 28, inciso 29 #177 SUMAC y Pág. 14 #187 SUMAC).

89. La Directora de Recursos Humanos Sra. Berríos conoció al demandante por primera vez en el mes de julio a agosto. (Pág. 108, L. 1536-1543 del Anejo 2 #166 SUMAC).

90. La Directora de Recursos Humanos Sra. Berríos no pertenece ni ha ocupado puesto alguno en un partido político, aunque si ejerce el voto. (Pág. 116, L. 1654- 1662 y Pág. 117, L. 1663-1667 del Anejo 2 #166 SUMAC).

91. La Directora de Recursos Humanos Sra. Berríos indicó que el alcalde Soto nunca ha hablado con ella sobre a que partido político pertenecen los empleados del municipio y tampoco nunca le ha mencionado que el Sr. Roberto Negrón Miró pertenece al PNP. (Pág. 133 y Pág. 134, L. 1910-1917 del Anejo 2 #166 SUMAC).

92. La Directora de Recursos Humanos Sra. Berríos explicó que las funciones del demandante consistían en vigilar las instalaciones municipales, restringían la entrada y salida de las personas que no fueran empleados. Además, el Sr. Roberto Negrón de noche, se supone que rindiera informes si había una situación o si veía un vandalismo tenía que informarlo. (Pág. 148 del Anejo 2 #166 SUMAC).

93. Aunque la Sra. Berríos sabía que luego del 31 de enero de 2022 el demandante no iba a continuar en su nombramiento transitorio, aun así le recibía los documentos porque era empleado. (Pág. 164, L. 2351-2361 del Anejo 2 #166 SUMAC).

94. La Sra. Berríos no le dijo al demandante que su contrato transitorio no iba a ser renovado y le siguió cogiendo documentos porque quería evitar conflictos con el demandante porque ya en varias ocasiones en sus llamadas telefónicas le faltaba el respeto, le hablaba en tono agresivo y quería evitar controversias. (Pág. 165 y Pág. 166, L. 2376-2385 del Anejo 2 #166 SUMAC).

95. En enero de 2022 es la primera vez que la Sra. Berríos adviene en conocimiento de que el Sr. Roberto C. Negrón padecía de alguna condición médica. (Pág. 223 del Anejo 2 #166 SUMAC).

96. El demandante le hizo un reclamo a la Sra. Limary Berríos de que el Municipio de Adjuntas le debía $1,000.00 del premium pay porque el pago era de $2,000.00, pero no se le hizo el pago de un restante de $1,000.00 porque él ya no era empleado. (Pág. 230-234 del Anejo 2 #166 SUMAC).

97. El alcalde Soto desconoce la afiliación política de la familia del demandante Roberto Carlos Negrón Miró. (Pág. 6 del Anejo 3 #166 SUMAC).

98. El alcalde Soto Rivera se entera de que el demandante Roberto Negrón Miró es empleado del Municipio de Adjuntas cuando empieza a reunirse con los empleados por dependencia. (Pág. 6 del Anejo 3 #166 SUMAC).

99. El acalde Soto Rivera visitó las áreas de trabajo para conocer a los empleados, pero al llegar al área donde trabaja el Sr. Roberto Negrón no lo vio trabajando allí, pero preguntó a otros empleados quiénes eran los guardianes que faltaban. (Pág. 7 del Anejo 3 #166 SUMAC).

100. El alcalde Soto Rivera y el Sr. Ariel Díaz, Director de Recreación y Deportes, nunca vieron como el demandante se desempeñaba en su trabajo. (Pág. 52, L. 25-27 y Pág. 53, L. 1-3 del Anejo 3 #177 SUMAC).

101. El alcalde Soto Rivera nunca ha examinado el expediente del demandante Roberto Carlos Negrón Miró y no lo tomó en consideración para no renovarle el contrato. (Pág. 11 del Anejo 3 #166 SUMAC).

102. El alcalde Soto Rivera indicó que las razones para no renovarle el contrato al demandante, además de ser un empleado transitorio, fueron: la falta de disponibilidad del empleado, la falta de respeto a otros empleados y a la Directora de Recursos Humanos ya que se proyectaba hostil y agresivo (Pág. 15 y Pág. 16, L. 1-5 del Anejo 3 #166 SUMAC y del Anejo 3 #177 SUMAC).

103. Según el alcalde Soto Rivera las faltas de respeto consistían en que se dirigía con tono de voz alto, mirada intimidante, las manos las movía y por su expresión facial. El alcalde Soto Rivera dijo que el demandante se proyectaba de forma hostil y agresiva. (Pág. 22 y Pág. 23, L. 1-3 del Anejo 3 #177 SUMAC).

104. El alcalde Soto Rivera no tomó acción disciplinaria contra el demandante por actos de falta de respeto, hostilidad y agresividad, pero se lo advirtió en la reunión

de febrero de 2021. (Pág. 24, L. 23-26 y Pág. 25, L. 1-19 del Anejo 3 #177 SUMAC).

105. El demandante se ponía hostil en la oficina de Recursos Humanos cuando se le asignaban y cambiaban las áreas de empleo y los horarios. (Pág. 54, L. 5-15 del Anejo 3 #177 SUMAC).

106. Según el alcalde Soto Rivera el demandante Roberto Negrón le faltó el respeto porque en una reunión de todos los vigilantes el alcalde Soto dijo que él pasaba por las áreas y que no encontraba a los empleados y el demandante le dijo al alcalde que eso era un embuste. (Pág. 17 del Anejo 3 #166 SUMAC).

107. Antes de febrero de 2021, el alcalde Soto Rivera fue a la pista atlética como entre tres o cuatro ocasiones y no encontró al demandante Negrón Miró en su área de trabajo. (Pág. 37, L. 23-26 del Anejo 3 #166 SUMAC; Pág. 38, L. 1-8 del Anejo 3 #177 SUMAC y Pág. 23 #187 SUMAC).

108. Al tomar la decisión de no renovarle el contrato al demandante, el alcalde Soto Rivera no tomó en consideración los años de servicio del demandante. (Pág. 46, L. 12-19 del Anejo 3 #177 SUMAC y Pág. 24 #187 SUMAC).

109. Durante la incumbencia del alcalde Soto Rivera ha habido varios empleados transitorios que no se le ha renovado el contrato de empleo. (Pág. 49, L. 4-8 del Anejo 3 SUMAC).

110. Al momento de la no renovación del contrato del demandante Roberto Negrón Miró el 31 de enero del 2022 en el Municipio había muchos más empleados transitorios. (Pág. 13, L. 25-26 y Pág. 14, L. 1-3 del Anejo 3 #177 SUMAC).

111. Para la fecha de la no renovación del contrato del demandante Roberto Negrón Miró, el único empleado con problemas de horario y/o disponibilidad era el demandante. (Pág. 33, L. 8-17 del Anejo 3 #177 SUMAC).

112. El alcalde Soto Rivera no discutió con el demandante Roberto Negrón Miró alguna alternativa de horario para que este último pudiera seguir su negocio de barbero. (Pág. 33, L. 18-22 del Anejo 3 #177 SUMAC).

113. Al alcalde Soto Rivera no dio órdenes al Municipio para que el demandante Negrón Miró se le liquidaran o tomara vacaciones. (Pág. 45, L. 19-26; Pág. 46, L. 1-6 del Anejo 3 #177 SUMAC).

114. Para diciembre del 2021, el alcalde conoció que el demandante Don Roberto estaba enfermo de COVID. (Pág. 37, L. 15-18 del Anejo 3 #166 SUMAC; Pág. 37, L. 15-18 del Anejo 3 #177 SUMAC y Pág. 23 #187 SUMAC).

115. En el municipio no hubo problemas económicos para no removerse el puesto transitorio del demandante. (Pág. 54, L. 1-4 del Anejo 3 #177 SUMAC).

116. El demandante reconoció que a partir del 31 de agosto de 2015 cuando venció su primer nombramiento

como transitorio a veces firmaba las extensiones de nombramiento transitorio. (Pág. 62, L. 11-21 del Anejo 1 #166 SUMAC).

Luego de exponer las determinaciones de hechos y el derecho aplicable, el TPI atendió las solicitudes de sentencia sumaria de ambas partes y, aunque reconoció que tanto la parte apelada como el apelante incumplieron con varios requisitos formales de la Regla 36.3 de Procedimiento Civil, *infra*, decidió considerar los escritos y resolver las controversias planteadas.

En cuanto a la alegada violación al debido proceso de ley, concluyó que el apelante ocupó en todo momento un puesto transitorio y nunca adquirió estatus de empleado de carrera. Señaló que todos los documentos oficiales del Municipio de Adjuntas, incluyendo los nombramientos, certificaciones e informes de cambio, lo identificaban como empleado transitorio. Además, expresó que el propio apelante reconoció conocer la naturaleza de su nombramiento y haber firmado extensiones de este. Determinó que la duración prolongada del empleo, desde 2015 hasta 2022, no creó por sí sola una expectativa legítima de permanencia. Por ello, resolvió que el Municipio no estaba obligado a renovar su nombramiento, demostrar justa causa para la cesantía ni celebrar una vista previa, ya que el señor Negrón carecía de una expectativa de continuidad en el empleo. En consecuencia, concluyó que no se le violó el debido proceso de ley.

Respecto a la reclamación de discrimen político, el Tribunal reconoció que tanto la Constitución de Estados Unidos como la de Puerto Rico protegen a los empleados públicos, incluidos los transitorios, contra el discrimen por ideas políticas. Sin embargo, concluyó que el apelante no logró demostrar los elementos necesarios para establecer dicha causa de acción. Señaló que, aunque trabajó durante la administración del exalcalde, el Sr. Jaime Barlucea, y participaba en un programa radial municipal, ello no evidenciaba una identificación política clara ni una participación partidista activa. Asimismo, destacó que el señor Soto declaró desconocer la afiliación política del señor Negrón y que este último admitió que el alcalde no

sabía por quién votaba. Asimismo, tomó en consideración que la nueva administración mantuvo el aumento de horas y salario previamente concedido al apelante y le renovó sus nombramientos transitorios por más de un año. Igualmente, resaltó que se realizaron ajustes en sus horarios para acomodar su trabajo como barbero y que no se demostró que hubiera sido sustituido por una persona de una afiliación política distinta. Además, indicó que luego de enero de 2022 no se contrataron nuevos vigilantes transitorios. Por ello, concluyó que el apelante no estableció un caso de discrimen político. Añadió que, aun si hubiese existido alguna conducta discriminatoria, el Municipio presentó razones legítimas para no renovar el nombramiento, entre ellas la necesidad del servicio, la falta de disponibilidad del apelante y señalamientos relacionados con su conducta hacia otros empleados y la Directora de Recursos Humanos.

Sobre la causa de acción por represalias, determinó que el señor Negrón no identificó claramente cuál fue la actividad protegida que supuestamente provocó la acción adversa. Consideró que, si la alegación se refería a las gestiones realizadas por el apelante ante Recursos Humanos relacionadas con conflictos entre sus horarios de trabajo y su negocio de barbería, no existía una conexión causal suficiente entre dichas gestiones y la cesantía ocurrida varios meses después. Destacó, además, que el Municipio de Adjuntas accedió a modificar sus horarios para acomodar sus necesidades. Por otro lado, si la actividad protegida alegada era la notificación de su condición de asma, señaló que la información médica fue solicitada por Recursos Humanos y que, para cuando se presentó la certificación médica, ya se había tomado la decisión de no renovar el nombramiento. A la luz de ello, concluyó que el apelante no logró establecer una reclamación válida bajo la Ley Núm. 115, *supra*.

En cuanto a la reclamación por discrimen por impedimento al amparo de la Ley Núm. 44, *supra*, concluyó que el señor Negrón tampoco cumplió con los requisitos necesarios. Indicó que la única

evidencia médica presentada fue una certificación emitida el 26 de enero de 2022 que hacía referencia a un historial de asma bronquial, pero que no describía limitaciones funcionales ni establecía que la condición restringiera sustancialmente alguna actividad principal de la vida. Asimismo, destacó que el apelante admitió no haber recibido tratamiento especializado reciente para dicha condición. De igual forma, determinó que el Municipio, la Directora de Recursos Humanos y el alcalde desconocían la alegada condición antes de que se decidiera no renovar el nombramiento. Además, resolvió que el apelante no demostró que haber padecido COVID-19 constituyera un impedimento protegido por la Ley Núm. 44, *supra*, ni que dicha condición limitara sustancialmente sus actividades cotidianas. Por ello, concluyó que no hubo discrimen por razón de impedimento.

Finalmente, entendió innecesario discutir la reclamación de daños y la doctrina de inmunidad condicionada, ya que determinó que el apelante no logró probar ninguna de las causas de acción incluidas en su demanda enmendada. En consecuencia, declaró Ha Lugar la solicitud de sentencia sumaria presentada por la parte apelada, No Ha Lugar la solicitud de sentencia sumaria presentada por el apelante y desestimó la demanda enmendada.

Inconforme con este dictamen, el 6 de mayo de 2026, el apelante presentó el recurso de epígrafe y formuló los siguientes señalamientos de error:

> **Erró el Tribunal de Primera Instancia al dictar sentencia sumaria a favor de la parte demandada, pese a la existencia de controversias genuinas de hechos materiales relacionadas con la naturaleza real del empleo del apelante, la continuidad de sus funciones por cerca de siete años, el trato recibido bajo la nueva administración municipal, los cambios en sus condiciones de trabajo, el manejo de su condición de salud y la alegada motivación discriminatoria de la no renovación, en violación al estándar aplicable bajo la Regla 36 de Procedimiento Civil.**
>
> **Erró el Tribunal de Primera Instancia al concluir, como cuestión de derecho, que el apelante era un mero empleado transitorio sin expectativa jurídicamente protegida de permanencia en el empleo, y al disponer sumariamente de sus reclamaciones sin considerar adecuadamente la prueba relacionada con la duración**

**continua de su empleo, la naturaleza permanente de las funciones desempeñadas, el reconocimiento de beneficios marginales y las demás circunstancias del caso que requerían adjudicación en los méritos.**

**Erró el Tribunal de Primera Instancia al concluir sumariamente que no procedía la reclamación del apelante bajo la Ley Núm. 44, al determinar que la certificación médica presentada no acreditaba una condición protegida y que los demandados no tenían conocimiento de su condición de salud, a pesar de que del expediente surgían controversias reales sobre el conocimiento patronal de la condición pulmonar del apelante, la suficiencia del aviso brindado, la consideración solicitada por razón de salud y el trato recibido tras ello.**

**Erró el Tribunal de Primera Instancia al concluir que no procedía la reclamación por discrimen político, resolviendo sumariamente inferencias sobre conocimiento, motivación y trato diferenciado que requerían la celebración de un juicio en los méritos, particularmente en cuanto a la identificación política del apelante, el conocimiento de ésta por la nueva administración y la relación entre dicha circunstancia y la no renovación de su empleo.**

**Erró el Tribunal de Primera Instancia al desestimar la acción en daños y perjuicios y las reclamaciones vinculadas a discrimen y represalias mediante un enfoque restrictivo y formalista, sin reconocer que la querella alegaba humillaciones, cambios adversos en las condiciones de trabajo, inacción ante las quejas del apelante, trato hostil, discrimen y daños emocionales y económicos, todo lo cual requería apreciación de prueba y credibilidad en un juicio en los méritos, y no por la vía sumaria.**

Atendido el recurso, le concedimos a la parte apelada hasta el 10 de junio de 2026, para presentar su oposición al recurso. Oportunamente, la parte apelada presentó su oposición y negó que el TPI cometiera los errores que el señor Negrón le imputó. Con el beneficio de la comparecencia de ambas partes, procedemos a atender el asunto ante nos. *Veamos.*

II.

**-A-**

En esencia, como mencionamos anteriormente, el principio rector de las Reglas de Procedimiento Civil es proveerles a las partes envueltas en un pleito legal, una solución justa, rápida y económica en todo procedimiento. Regla 1 de Procedimiento Civil, 32 LPRA Ap. V, R.1. El mecanismo de sentencia sumaria provisto en la Regla 36 de

Procedimiento Civil, 32 LPRA Ap. V, R. 36, hace viable este objetivo en aquellos casos en que surja de forma clara que no existen controversias materiales de hechos que requieren ventilarse en un juicio plenario y el derecho así lo permita.

Conforme a la Regla 36.3 (e) de Procedimiento Civil, *supra,* se dictará sentencia sumaria "si las alegaciones, deposiciones, contestaciones e interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente, y, además, si el derecho aplicable así lo justifica". A estos efectos, el foro judicial tiene la potestad para disponer de asuntos pendientes sin la necesidad de celebrar un juicio, esto debido a que lo que restaría sería aplicar el derecho a los hechos no controvertidos. *Roldán Flores v. M. Cuebas et al.,* 199 DPR 664, 676 (2018).

Es menester destacar que, solo procede dictar sentencia sumaria cuando surge claramente que el promovido no puede prevalecer y que el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia. *Mejías et al. v. Carrasquillo et al.,* 185 DPR 288, 299 (2012). Por lo tanto, no procede dictar sentencia sumaria cuando no existe una clara certeza sobre todos los hechos materiales en la controversia. Íd. Aun así, "[c]ualquier duda no es suficiente para derrotar una moción de sentencia sumaria, sino que tiene que ser una cuestión que permita concluir que existe una controversia real y sustancial sobre hechos relevantes y pertinentes". *Aponte Valentín et al. v. Pfizer Pharm.*, 208 DPR 263, 277 (2021).

La Regla 36.2 de Procedimiento Civil, *supra*, permite que cualquier parte presente una moción, basada en declaraciones juradas, o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación. Al solicitar dicho remedio, la parte que promueve la sentencia sumaria "deberá establecer su derecho con

claridad y demostrar que no existe controversia sustancial sobre algún hecho material, o sea, sobre ningún componente de la causa de acción". *Mun. de Añasco v. ASES et al.,* 188 DPR 307, 310 (2013).

Por su parte, la parte que se opone a la sentencia sumaria no puede tomar una actitud pasiva y descansar en las aseveraciones o negaciones consignadas en su alegación. *Roldán Flores v. M. Cuebas et al., supra,* pág. 677. Por el contrario, esa persona viene obligada a enfrentar la moción de su adversario de forma tan detallada y especifica como lo ha hecho el promovente en su solicitud puesto que, si incumple con lo antes mencionado corre el riesgo de que se dicte sentencia es su contra. *SLG Zapata-Rivera v. J.F. Montalvo,* supra, pág. 432. Específicamente, la Regla 36.3 de Procedimiento Civil, *supra,* expone los criterios que debe cumplir la parte que se opone a la moción de sentencia sumaria. Al amparo de dicha regla, en la oposición a la solicitud de sentencia sumaria el promovido debe, como parte de su carga desglosar los hechos sobre los que aduce que no existe controversia, y, además para cada uno de ellos debe especificar la página o párrafo de la declaración jurada u otra prueba admisible en evidencia que lo apoya.

En síntesis, no procede dictar sentencia sumaria cuando: (1) existen hechos materiales y esenciales en controversia; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción de sentencia sumaria una controversia real sobre algún hecho material y esencial; (4) como cuestión de derecho no procede. *Pepsi-Cola v. Mun. Cidra, et al.,* 186 DPR 713, 757 (2012).

Ahora bien, según *Vera v. Dr. Bravo,* 161 DPR 308, 334-335 (2004) este Foro Apelativo utilizará los mismos criterios que el TPI al determinar si procede una sentencia sumaria. Sin embargo, el Tribunal Supremo especifica que, al revisar la determinación de primera instancia sólo podemos considerar los documentos que se presentaron ante el TPI. Íd. Además, sólo podemos determinar si existe o no alguna

controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. Íd. Es decir, no podemos adjudicar los hechos materiales y esenciales en disputa, ya que esta tarea le corresponde al TPI. Íd.

Por otro lado, en *Meléndez González et al. v. M. Cuebas,* 193 DPR 100*,* 118 (2015), el Tribunal Supremo estableció que al revisar una determinación del TPI en la que se concedió o denegó una moción de sentencia sumaria debemos: (1) examinar de *novo* el expediente; (2) revisar que la moción de sentencia sumaria y su oposición cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil, *supra,* y con los discutidos en *SLG Zapata-Rivera v. J. Montalvo, supra;* (3) en el caso de una revisión de una sentencia dictada sumariamente, debemos revisar si en realidad existen hechos materiales en controversia, y de haberlos, exponer concretamente cuáles están en controversia y cuáles no; y (4) de encontrar que los hechos materiales no están en controversia, debemos revisar de *novo* si el Tribunal de Primera Instancia aplicó correctamente el derecho. *Rivera Matos, et al. v. Triple-S et al.,* 204 DPR 1010, 1025 (2020).

**-B-**

El Art. 11.004 de la Ley Núm. 81 de 30 de agosto de 1991, según enmendada, conocida como *La Ley de Municipios Autónomos de Puerto Rico*[27] (Ley Núm. 81), 21 LPRA sec. 4554, clasifica los empleados municipales en distintas categorías, a saber: empleados de confianza, empleados regulares de carrera, empleados probatorios de carrera, empleados transitorios y empleados irregulares. En lo pertinente, la ley dispone que los nombramientos transitorios no podrán exceder de doce (12) meses, salvo en aquellos casos expresamente contemplados por el estatuto, tales como la sustitución de empleados de carrera en licencia,

---

[27] Reconocemos que la Ley Núm. 81-1991, *supra*, fue derogada por la Ley Núm.107-2020, según enmendada, conocida como *Código Municipal de Puerto Rico*, 21 LPRA sec. 7001, *et seq.* Sin embargo, para propósitos de la presente controversia, se hará referencia a Ley Núm. 81-1991, *supra*, ya que el apelante fue nombrado como empleado transitorio en el año 2015, por lo que su nombramiento y los hechos objeto de este caso se rigen por dicho estatuto.

proyectos especiales de duración determinada o programas sujetos a la disponibilidad de fondos estatales o federales. Art. 11.004(c) de la Ley Núm. 81, 21 LPRA sec. 4554. Asimismo, establece que los empleados con nombramientos transitorios no adquieren la condición de empleados de carrera ni pueden obtener un nombramiento probatorio o regular en el servicio de carrera sin haber cumplido previamente con los procedimientos de reclutamiento y selección exigidos por ley. Íd.

Por otro lado, el Art. 11.006(e) de la Núm. 81, 21 LPRA sec. 4556, dispone que los puestos transitorios serán clasificados utilizando los mismos criterios aplicables a los puestos de carrera y se asignarán a las clases correspondientes dentro del plan de clasificación municipal.

En cuanto a los derechos asociados al empleo público, el Tribunal Supremo ha reconocido que un empleado posee un interés protegido en la retención de su empleo cuando dicho interés surge de una disposición legal o cuando las circunstancias particulares del empleo generan una expectativa legítima de continuidad. *Depto. Recs. Naturales v. Correa*, 118 DPR 689, 693 (1987). De existir tal interés, la autoridad nominadora deberá observar las garantías mínimas del debido proceso de ley antes de privar al empleado de su puesto. *S.L.G. Giovanetti v. E.L.A.*, 161 DPR 492, 506-507 (2004).

No obstante, la jurisprudencia ha establecido consistentemente que quien ocupa un puesto transitorio no posee una expectativa legítima de permanencia en el empleo ni un derecho a que su nombramiento sea renovado indefinidamente. *Depto. Recs. Naturales v. Correa*, supra, pág. 697. El interés protegido que surge de un nombramiento transitorio se limita al término específico para el cual fue expedido. Íd., pág. 699. Por ello, una vez vence dicho término y no se emite un nuevo nombramiento, la separación del servicio constituye una cesantía y no una suspensión o destitución. Íd., pág. 697.

Consecuentemente, cuando un nombramiento transitorio expira y no es renovado, la entidad gubernamental no viene obligada a demostrar justa causa para la cesantía. Íd., pág. 700. De igual forma,

el Tribunal Supremo ha señalado que, por regla general, la expiración de un nombramiento transitorio no requiere la celebración de una vista previa y no constituye una violación al debido proceso de ley. *Aponte Burgos v. Aponte Silva,* 154 DPR 117, 132 (2001).

Ahora bien, aunque el mero hecho de ocupar un puesto transitorio no genera una expectativa de continuidad, corresponde examinar las circunstancias particulares de cada caso para determinar si la actuación de la agencia creó una expectativa legítima de retención en el empleo. *Orta v. Padilla Ayala,* 131 DPR 227, 245 (1992). Sin embargo, la jurisprudencia ha aclarado que la ocupación prolongada de una posición, por sí sola, no crea un interés propietario protegido. Íd. Del mismo modo, el simple ofrecimiento de una plaza permanente, sin actos adicionales por parte de la agencia que demuestren inequívocamente la intención de materializar dicho ofrecimiento, únicamente genera una expectativa unilateral y resulta insuficiente para conferir un derecho de permanencia en el empleo. Íd., pág. 244.

**-C-**

La Ley Núm. 100, *supra,* prohíbe el discrimen en el empleo de un patrono contra un empleado por razón de su raza, edad, color, sexo, origen social o nacional, condición social, afiliación o ideas políticas y religión. *López Fantauzzi v. 100% Natural,* 181 DPR 92, 121 (2011). Este estatuto incorpora el lenguaje proveniente del Art. II Sec. 1 de la Constitución del Estado Libre Asociado de Puerto Rico, el cual prohíbe el discrimen en las clasificaciones allí mencionadas. *Garib Bazaín v. Hosp. Aux. Mutuo et al.,* 204 DPR 601, 615 (2020). Particularmente, en virtud de este mandato, el Tribunal Supremo ha reiterado que los empleados públicos están protegidos en sus cargos contra el discrimen por ideas políticas. *López v. Miranda,* 166 DPR 546, 558 (2005).

No obstante, para prevalecer en una acción fundada en discrimen político, es insuficiente una mera alegación de su existencia. Íd., pág. 561. El empleado público tiene el peso inicial de probar que la conducta protegida fue el factor "sustancial" o "motivante" para la

acción de despido o privación de sus condiciones de trabajo. Íd. En fin, la jurisprudencia ha reconocido que un caso *prima facie* de discrimen político puede establecerse cuando se demuestra la ausencia de una razón legítima para la cesantía, una clara identificación político-partidista y que el puesto fue ocupado por una persona afiliada a un partido distinto y afín a la autoridad nominadora. Íd., pág. 559-560. Una vez el empleado establece un caso *prima facie,* corresponde al patrono refutar la alegación de discrimen. Íd., pág. 560-561. Ello puede lograrse demostrando que existió una razón legítima para la acción tomada, evidenciando la inexistencia de discrimen político o atacando simultáneamente ambos elementos. *Alberty v. Bco. Gub. de Fomento*, 149 DPR 655, 664 (1999). A esos efectos, el patrono no está obligado a articular formalmente una explicación específica, siempre que la prueba presentada permita concluir que la decisión impugnada no respondió a motivos discriminatorios. *Ibáñez v. Molinos de P.R., Inc.*, 114 DPR 42, 53 (1983).

**-D-**

El Art. 2 de la Ley Núm. 115, 29 LPRA sec. 194a, establece que:

(a) Ningún patrono podrá despedir, amenazar o discriminar contra un "empleado con relación a los términos, condiciones, compensación, ubicación, beneficios o privilegios del empleo porque el empleado ofrezca o intente ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información ante un foro legislativo, administrativo o judicial en Puerto Rico, así como el testimonio, expresión o información que ofrezca o intente ofrecer, en los procedimientos internos establecidos de la empresa, o ante cualquier empleado o representante en una posición de autoridad, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada establecida por ley.

(b) Cualquier persona que alegue una violación a esta Ley podrá instar una acción civil en contra del patrono dentro de tres (3) años de la fecha en que ocurrió dicha violación y solicitar se le compense por los daños reales sufridos, las angustias mentales, la restitución en el empleo, los salarios dejados de devengar, beneficios y honorarios de abogado. La responsabilidad del patrono con relación a los daños y a los salarios dejados de devengar, será el doble de la cuantía que se determine causó la violación a las disposiciones de esta Ley.

(c) El empleado deberá probar la violación mediante evidencia directa o circunstancial. El empleado podrá

además establecer un caso prima facie de violación a la ley probando que participó en una actividad protegida por esta Ley y que fue subsiguientemente despedido, amenazado o discriminado en su contra de su empleo. Una vez establecido lo anterior, el patrono deberá alegar y fundamentar una razón legítima y no discriminatoria para el despido. De alegar y fundamentar el patrono dicha razón, el empleado deberá demostrar que la razón alegada por el patrono era un mero pretexto para el despido. (Énfasis nuestro).

Como podemos observar, Ley Núm. 115, *supra,* brinda protección a empleados frente a represalias que pueda tomar un patrono contra estos por proveer testimonio, expresión o información, ya sea verbal o escrita, ante un foro judicial, legislativo o administrativo. *S.L.G. Rivera Carrasquillo v. A.A.A.,* 177 DPR 345, 361 (2009); *Ocasio v. Kelly Servs.* 163 DPR 653, 684 (2005). A su vez, el referido estatuto protege a los empleados contra represalias por ofrecer o intentar ofrecer información o expresiones en procedimientos internos de una empresa o ante personal con autoridad, siempre que no sean difamatorias ni divulguen información privilegiada. Art. 2 de la Ley Núm. 115, *supra.* Así, el propósito del estatuto es proteger a los empleados de cualquier discrimen por medio de represalias por participar en una actividad protegida. *Ocasio v. Kelly Servs.* supra, pág. 684.

Un obrero tiene dos (2) maneras de establecer un caso de represalias, esto es: (a) probar la violación mediante evidencia directa o circunstancial; o (b) establecer la presunción *juris tantum* de la Ley Núm. 115, *supra. S.L.G. Rivera Carrasquillo v. A.A.A.,* supra, pág. 362. Así, una vez el obrero presenta un caso *prima facie*, se crea una presunción de que el despido fue en represalias. Íd., pág. 361. Un empleado establece un caso *prima facie* cuando prueba que: (1) participó en una actividad protegida por la ley; y (2) subsiguientemente fue despedido, amenazado o discriminado en su empleo. Íd., pág. 362. Establecido lo anterior, le corresponde al patrono rebatir la presunción fundamentando el despido legítimamente. Íd. En caso de que el patrono

cumpla con el segundo paso, el empleado debe demostrar que la razón alegada por el patrono es un mero pretexto para la acción adversa. Íd.

En cuanto al requisito de demostrar el vínculo entre la actividad protegida y la acción adversa, el Tribunal Supremo ha señalado que la proximidad temporal entre ambos eventos puede ser suficiente para establecer el caso *prima facie*. *Rivera Menéndez v. Action Service*, 185 DPR 431, 446 (2012). Ello responde al interés legislativo de evitar que el empleado tenga que enfrentar una carga probatoria excesiva en la etapa inicial de su reclamación. *Feliciano Martes v. Sheraton*, 182 DPR 368, 399-400 (2011).

Ahora bien, cabe precisar que, algunos foros apelativos federales han considerado que un intervalo de aproximadamente cuatro meses entre ambos eventos no constituye evidencia indirecta suficiente para establecer causalidad. *Feliciano Martes v. Sheraton*, supra, pág. 398. Por ello, cuando la cercanía temporal no resulta suficiente o adecuada para demostrar el vínculo causal, el empleado puede recurrir a cualquier otra evidencia que tienda a establecer dicha conexión. *Velázquez Ortiz v. Mun. de Humacao*, 197 DPR 656, 671(2017).

En particular, el Tribunal Supremo ha reconocido que el nexo causal puede inferirse mediante evidencia que demuestre que el empleado recibió un trato distinto al dispensado a otros trabajadores; que existió un patrón de conducta antagónica dirigido en su contra; que las razones ofrecidas por el patrono para justificar la acción adversa contienen inconsistencias o contradicciones significativas; o cualquier otra circunstancia probatoria que, examinada en su conjunto, permita concluir razonablemente que la medida disciplinaria estuvo relacionada con la actividad protegida. *Feliciano Martes v. Sheraton*, supra, pág. 400. La determinación de si existe dicho nexo causal requiere necesariamente un análisis particularizado de las circunstancias de cada caso. Íd.

Por otro lado, el Tribunal Supremo también ha aclarado el alcance de la responsabilidad por actos de represalia bajo la Ley Núm.

115, *supra*. En particular, ha resuelto que las actuaciones de supervisores, administradores, oficiales o agentes constituyen, para fines de la ley, actuaciones del propio patrono, pues estos ejercen la autoridad que les ha sido delegada por este último. *Caballer Rivera v. Adriel Toyota et al.*, 200 DPR 120, 130-131 (2018). De igual forma, se ha expresado que cuando un agente adopta medidas que afectan la compensación, beneficios o condiciones de empleo de otro trabajador, actúa ejerciendo la autoridad patronal. *Santiago Nieves v. Braulio Agosto Motors*, 197 DPR 369, 380 (2017).

Consecuentemente, la responsabilidad civil por actos de represalia recae sobre el patrono. Íd. La inclusión de los agentes dentro de la definición estatutaria de "patrono" responde al propósito de garantizar la responsabilidad vicaria del empleador por las actuaciones realizadas por sus representantes en el ejercicio de la autoridad delegada, evitando que este pueda evadir responsabilidad alegando que los actos fueron ejecutados por terceros y no directamente por la entidad patronal. *Santiago Nieves v. Braulio Agosto Motors*, supra, pág. 379

### -E-

La Ley Núm. 44, *supra*, se adoptó con el objetivo de garantizar la igualdad en circunstancias en las cuales personas con discapacidad física, mental o sensorial enfrentan tratos discriminatorios que limitan su oportunidad de participar, desempeñarse y competir adecuadamente en el campo laboral. *Guardiola Álvarez v. Depto. de la Familia*, 175 DPR 668, 683 (2009). El Art. 5 de la referida Ley, 1 LPRA sec. 505, establece una prohibición a que tanto las instituciones públicas como las empresas privadas ejerzan, pongan en vigor o utilicen procedimientos, métodos o prácticas discriminatorias de empleo por razón de impedimentos físicos, mentales o sensoriales. *Torres Rivera v. Econo Rial, Inc.*, 208 DPR 346, 356-357 (2021). A su vez, dispone que esta prohibición se extiende desde la etapa de reclutamiento hasta los diferentes términos, condiciones y

privilegios de empleo, entre ellos: la compensación, los beneficios marginales y las facilidades de acomodo razonable. Íd.

Para quedar cobijado por esta ley protectora, el empleado debe demostrar que es una persona con discapacidad y que está cualificado para realizar las funciones esenciales del puesto, con o sin acomodo razonable. *García v. Darex PR Inc.*, 148 DPR 364 (1999). A tales efectos, el Art. 1(d) de la Ley Núm. 44, 1 LPRA sec. 501(d), define como persona con impedimentos físicos, mentales o sensoriales a aquella que presenta una condición de naturaleza motora, mental o sensorial que limite u obstaculice su desempeño laboral, académico o el disfrute pleno de la vida, siempre que se encuentre cualificada para realizar las funciones esenciales del empleo o área de estudio correspondiente, con o sin acomodo razonable. Íd. Asimismo, la protección estatutaria se extiende a aquellas personas cuyo impedimento limita sustancialmente una o más actividades principales de la vida diaria, a quienes poseen un historial previo de dicha condición y a quienes son percibidos como poseedores de tal impedimento, aun cuando no lo tengan. Íd. La definición también comprende aquellos impedimentos sensoriales que afecten sustancialmente la audición, la visión, el tacto, el olfato o el habla. Íd.

De igual forma, el Art. 2 de Ley Núm. 44, 1 LPRA sec. 502, prohíbe que cualquier persona natural o jurídica, ya sea directamente o por conducto de terceros, impida, restrinja, excluya o limite la participación de una persona con impedimentos por razón de dicha condición en programas o actividades organizadas, patrocinadas, administradas o dirigidas por instituciones públicas o privadas. Íd. La prohibición se extiende a programas y actividades de cualquier nivel educativo, independientemente de que reciban o no fondos públicos. Íd.

-**F**-

Las obligaciones pueden surgir de la ley, los contratos, los cuasicontratos, los actos ilícitos y de los actos u omisiones culposos o negligentes. Art. 1063 del Código Civil de 2020, 31 LPRA sec. 8984. En

lo pertinente a la responsabilidad civil extracontractual, el Art. 1536 del Código Civil de 2020, 31 LPRA sec. 10801, dispone que toda persona que, por culpa o negligencia, cause daño a otra viene obligada a repararlo. Para prevalecer en una reclamación de daños y perjuicios al amparo de dicho precepto, la parte reclamante debe demostrar: (1) la existencia de un daño real; (2) un acto u omisión culposa o negligente atribuible al demandado; y (3) la relación causal entre esa conducta y el perjuicio sufrido. *Nieves Díaz v. González Massas*, 178 DPR 820, 843 (1995).

La jurisprudencia ha definido el daño como cualquier menoscabo, ya sea material o moral, que afecte a una persona en sus bienes, patrimonio o intereses jurídicamente protegidos y cuya reparación corresponda a otro sujeto. *Valle v. ELA*, 157 DPR 1, 18 (2002). Por su parte, la culpa o negligencia consiste en la falta de la diligencia exigida por las circunstancias particulares de las personas, el tiempo y el lugar, o, en ausencia de una norma específica, aquella conducta que observaría una persona prudente y razonable. Art. 1163 del Código Civil de 2020, 31 LPRA sec. 9315.

De forma reiterada, nuestro Tribunal Supremo ha descrito la negligencia como la omisión del cuidado debido al no prever o anticipar las consecuencias razonablemente previsibles de una acción u omisión. *López v. Porrata Doria*, 169 DPR 135, 151 (2006). Sin embargo, dicho deber de previsión no alcanza todo riesgo imaginable, sino únicamente aquellos peligros que una persona prudente y razonable habría anticipado en circunstancias similares. *Santiago v. Sup. Grande*, 166 DPR 796, 808 (2006).

Corresponde a la parte demandante presentar prueba suficiente que coloque al tribunal en posición de determinar si existió negligencia. *Matos v. Adm. Servs. Médicos de P.R.*, 118 DPR 567, 569-570 (1987). Debido a que la negligencia no se presume, el peso de la prueba recae sobre quien la alega. *Vaquería Garrochales v. A.P.P.R.*, 106 DPR 799, 800 (1978); Regla 110(B) de Evidencia, 32 LPRA Ap. IV, R. 110(B). Esta

puede acreditarse mediante prueba directa o circunstancial. Regla 110(H) de Evidencia, 32 LPRA Ap. IV, R. 110(H). Asimismo, el estándar probatorio aplicable es el de preponderancia de la prueba. *SLG Colon-Rivas v. ELA*, 196 DPR 855, 864 (2016); Regla 110(F) de Evidencia, 32 LPRA Ap. IV, R. 110(F).

Cuando el daño alegado surge de una omisión, resulta indispensable demostrar que la parte demandada tenía un deber jurídico de actuar y que el perjuicio reclamado probablemente se habría evitado de haberse cumplido con dicho deber. *Soc. Gananciales v. G. Padín Co., Inc.*, 117 DPR 94, 105-106 (1986). Además, debe acreditarse que la omisión imputada fue, con mayor probabilidad, la causa del daño sufrido. *Santiago v. Sup. Grande*, supra, pág. 819. Como podemos observar, el elemento del nexo causal se encuentra estrechamente vinculado al concepto de previsibilidad. Así, para adjudicar responsabilidad, es necesario determinar si el presunto causante podía razonablemente prever que su conducta, activa u omisiva, generaría el daño reclamado. *Hernández Vélez v. Televicentro*, 168 DPR 803, 814 (2006).

Nuestro ordenamiento adopta la doctrina de la causalidad adecuada, conforme a la cual no toda condición necesaria para la producción del daño constituye una causa jurídicamente relevante, sino únicamente aquella que ordinariamente produce el resultado según el curso normal de los acontecimientos y la experiencia común. Íd., pág. 814. Desde esa perspectiva, un daño será atribuible a una conducta negligente cuando, examinado retrospectivamente, aparezca como una consecuencia natural y razonablemente previsible de dicha conducta. Íd.

En definitiva, la responsabilidad por negligencia descansa sobre la existencia de un deber jurídico de conducta dirigido a proteger a terceros de riesgos irrazonables y sobre el incumplimiento de ese deber por parte del causante del daño. *SLG Colón-Rivas v. ELA,* supra, pág. 864. De ahí que la obligación de indemnizar requiera la existencia de

una relación causal entre el acto u omisión imputado y el perjuicio sufrido, pues únicamente son resarcibles aquellos daños que constituyen una consecuencia del hecho generador de responsabilidad. *Estremera v. Inmobiliaria Rac, Inc.*, 109 DPR 852, 856 (1980).

Finalmente, en cuanto a las reclamaciones por discrimen político promovidas por empleados municipales, estas encuentran su fundamento en el Artículo II, Sección 1 de la Constitución de Puerto Rico, toda vez que la Ley Núm. 100, *supra*, no resulta aplicable a los municipios. *Rodríguez Cruz v. Padilla Ayala*, 125 DPR 486, 511 (1990).

**-G-**

La inmunidad condicionada protege a los funcionarios públicos contra demandas presentadas en su contra por haber ejercido de forma razonable y de buena fe funciones que contienen elementos de discreción. *De Paz Lisk v. Aponte Roque*, 124 DPR 472, 495 (1989). Esta protección permite que los funcionarios actúen con libertad y tomen decisiones sin sentir presiones y amenazas contra sus patrimonios. Íd. Así, "la inmunidad de los funcionarios públicos opera como una limitación sustantiva de la responsabilidad personal por daños en que puedan incurrir dichos funcionarios en el descargo de sus deberes y responsabilidades oficiales". *García v. ELA,* 163 DPR 800, 820 (2005); *Romero Arroyo v. ELA,* 127 DPR 724, 745 (1991). La inmunidad condicionada constituye una defensa afirmativa que puede ser reclamada por un funcionario de gobierno que haya sido demandado, por lo que a este último le compete probar que está protegido por dicha inmunidad. *Acevedo v. Srio. Servicios Sociales*, 112 DPR 256, 263 (1982).

Ahora bien, la inmunidad condicionada de funcionarios públicos tiene las siguientes limitaciones: (1) un funcionario o empleado que no actúa de buena fe es responsable; y (2) un empleado que actúa de buena fe responde si actuó irrazonablemente o si debió saber que su conducta era ilegal. Íd., pág. 262. Según *Acevedo v. Srio. Servicios Sociales, supra,* la buena fe se considera ausencia de malicia. Íd. En

otras palabras, la inmunidad condicionada no cubre actuaciones dolosas, fraudulentas, maliciosas o delictivas en que los funcionarios del gobierno puedan incurrir en el desempeño de sus funciones. *In re Colton Fontán*, 128 DPR 1, 8 (1991).

Por el contrario, no procede imponerle responsabilidad en su carácter personal cuando sus actuaciones se llevan a cabo de acuerdo con directrices oficiales, o cuando no existe prueba de mala fe, malicia o error en su conducta. *De Paz Lisk v. Aponte Roque, supra,* pág. 495. Así, al evaluar la defensa de inmunidad condicionada el tribunal deberá analizar: (1) si el demandante alega la privación de un derecho constitucional o estatutario; (2) si el estatuto alegadamente violado por el funcionario estaba claramente establecido al momento de los hechos; y, de ser así, (3) si el funcionario tenía conocimiento o si razonablemente debió tener conocimiento de que sus actuaciones violaban los derechos del demandante. *Wilson v. Layne,* 526 US 603, 609 (1999); *Mitchell v. Forsyth,* 472 US 511, 528 (1985).

### III.

Mediante sus señalamientos de error, el apelante sostuvo, en esencia, que el TPI incidió al disponer del pleito mediante sentencia sumaria. Particularmente, planteó que existían controversias genuinas de hechos materiales respecto a la naturaleza de su empleo municipal, la expectativa de continuidad en el puesto, la alegada motivación política detrás de la determinación de no renovar su nombramiento, el manejo de su condición de salud y la procedencia de sus reclamaciones al amparo de la Ley Núm. 44, *supra*, la Ley Núm. 115, *supra*, y el Art. 1536 del Código Civil, *supra*. A su juicio, dichas controversias requerían la celebración de un juicio en sus méritos y hacían improcedente la disposición sumaria del caso. No le asiste la razón. *Veamos.*

Como es sabido, es norma reiterada que el mecanismo de sentencia sumaria, consagrado en la Regla 36 de Procedimiento Civil, *supra*, persigue adelantar una solución justa, rápida y económica de

los pleitos, conforme al mandato rector de la Regla 1 de Procedimiento Civil, *supra*. Procede su concesión cuando de los documentos que obran en autos surge que no existe controversia real y sustancial sobre hechos esenciales y pertinentes y el derecho aplicable así lo justifica. *Roldán Flores v. M. Cuebas et al.*, supra, pág. 676; Regla 36.3(e) de Procedimiento Civil, *supra*.

Al revisar la concesión de una solicitud de sentencia sumaria, este Tribunal Apelativo examina el expediente de *novo* y aplica los mismos criterios que el TPI. *Vera v. Dr. Bravo*, supra, págs. 334-335; *Meléndez González et al. v. M. Cuebas*, supra, pág. 118. Asimismo, nos corresponde evaluar si la moción y su oposición cumplieron con los requisitos formales establecidos en la Regla 36.3 de Procedimiento Civil, *supra*, y determinar si existen hechos materiales en controversia o si únicamente resta aplicar el derecho a hechos no disputados. *Rivera Matos et al. v. Triple-S et al.*, supra, pág. 1025.

De entrada, advertimos que ninguna de las partes observó con estricto rigor los requisitos técnicos exigidos por la Regla 36.3 de Procedimiento Civil, *supra*. Tanto la solicitud de sentencia sumaria como la oposición presentada contienen deficiencias en la formulación y presentación de los hechos propuestos como incontrovertidos, apartándose en ciertos aspectos del formato y grado de especificidad que exige la normativa procesal vigente. Ciertamente, ello no constituye un asunto de poca importancia. Nuestro ordenamiento ha reiterado que el cumplimiento con dichas exigencias no es un mero formalismo, sino una herramienta indispensable para delimitar adecuadamente las controversias fácticas y facilitar la función adjudicativa de los tribunales.

No obstante, las particularidades de este caso nos colocan en posición de ejercer nuestra función revisora sin necesidad de devolver el asunto para procedimientos adicionales. Del expediente surge una extensa prueba documental, las partes tuvieron amplia oportunidad de exponer sus respectivas teorías y los fundamentos de sus

reclamaciones y defensas se encuentran suficientemente desarrollados. Más importante aún, aun examinando el expediente en el modo más favorable al apelante, la controversia planteada puede resolverse mediante la aplicación del derecho a hechos que, para fines prácticos, no presentan controversias materiales que requieran la celebración de un juicio evidenciario.

Por ello, al igual que hizo el TPI, procederemos a atender el recurso en sus méritos. Luego de revisar la totalidad del expediente, examinar detenidamente los argumentos de ambas partes y aquilatar la prueba documental que obra en autos, concluimos que no existen hechos materiales y sustanciales en controversia que impidan la disposición sumaria del caso. Así pues, adoptamos las determinaciones de hechos formuladas por el TPI en la Sentencia apelada, en la medida en que estas encuentran adecuado apoyo en la prueba documental que obra en el expediente. En consecuencia, resta determinar si dicho foro aplicó correctamente el derecho a los hechos que razonablemente pueden considerarse incontrovertidos.

Atenderemos conjuntamente los primeros dos señalamientos de error por encontrarse estrechamente relacionados. En esencia, el apelante sostiene que el TPI erró al concluir que ostentaba un nombramiento transitorio sin expectativa jurídicamente protegida de permanencia y al determinar que no existían controversias materiales de hechos respecto a la naturaleza real de su empleo. Particularmente, argumentó que la prolongada duración de su relación laboral con el municipio, la continuidad de las funciones desempeñadas durante aproximadamente siete (7) años, la alegada permanencia de dichas funciones y el disfrute de ciertos beneficios marginales impedían resolver sumariamente sus reclamaciones. No le asiste la razón.

Según surge del expediente, resulta incontrovertido que durante todo el período pertinente el apelante ocupó puestos mediante nombramientos transitorios sucesivos. Asimismo, no existe controversia respecto a que nunca completó los procedimientos de

reclutamiento y selección requeridos para ingresar al servicio de carrera ni recibió un nombramiento probatorio o regular en dicho servicio. Por consiguiente, la controversia no gira en torno a la clasificación formal de su puesto, sino a si las circunstancias particulares de su empleo fueron suficientes para generar una expectativa legítima de continuidad protegida por nuestro ordenamiento jurídico.

Como expusimos anteriormente, el Art. 11.004 de la Ley Núm. 81, *supra*, distingue claramente entre los empleados de carrera y los empleados transitorios. El legislador dispuso expresamente que los empleados transitorios no adquieren la condición de empleados de carrera ni pueden obtener un nombramiento probatorio o regular sin cumplir previamente con los procedimientos establecidos por ley. Art. 11.004(c) de la Ley Núm. 81, *supra*. A tono con ello, nuestro Tribunal Supremo ha reiterado consistentemente que quien ocupa un puesto transitorio no posee una expectativa legítima de permanencia en el empleo ni un derecho a que su nombramiento sea renovado indefinidamente. *Depto. Recs. Naturales v. Correa*, supra, pág. 697; *Aponte Burgos v. Aponte Silva*, supra, pág. 131.

Ciertamente, la jurisprudencia reconoce que, en circunstancias excepcionales, las actuaciones de una entidad gubernamental podrían generar una expectativa legítima de retención en el empleo aun cuando el puesto ocupado sea formalmente transitorio. *Orta v. Padilla Ayala*, supra, pág. 245. Sin embargo, la misma jurisprudencia ha sido igualmente enfática al aclarar que la mera ocupación prolongada de una posición transitoria no crea, por sí sola, un interés propietario protegido. Íd. Del mismo modo, el mero transcurso del tiempo, la renovación sucesiva de nombramientos o la realización de funciones que también podrían ser desempeñadas por empleados de carrera resultan insuficientes para transformar un nombramiento transitorio en uno permanente o para crear un derecho de continuidad en el empleo.

Examinada la prueba que obra en el expediente, observamos que el apelante descansa principalmente en la duración de su empleo, la continuidad de las funciones desempeñadas y el disfrute de determinados beneficios. Sin embargo, ninguno de esos elementos, individual o colectivamente considerados, demuestra que el Municipio de Adjuntas realizara actos afirmativos e inequívocos dirigidos a conferirle un estatus distinto al que expresamente reflejaban sus nombramientos. Tampoco identifica evidencia que permita concluir razonablemente que la autoridad nominadora manifestó una intención clara de incorporarlo al servicio de carrera o de garantizarle la continuidad indefinida de su empleo.

En realidad, los hechos invocados por el apelante no generan una controversia material, sino una discrepancia con las consecuencias jurídicas derivadas de hechos esencialmente incontrovertidos. La prueba documental demuestra que ocupó puestos transitorios durante toda su relación laboral con el Municipio de Adjuntas y que cada nombramiento estaba sujeto a un término específico. Bajo la normativa antes discutida, ello es insuficiente para crear una expectativa legítima de permanencia protegida por las garantías del debido proceso de ley.

Consecuentemente, coincidimos con el TPI en que la expiración de los nombramientos transitorios del apelante y la determinación de no renovarlos constituyeron una cesantía al vencimiento del término correspondiente y no una destitución de un puesto respecto al cual poseyera un interés propietario protegido. *Depto. Recs. Naturales v. Correa*, supra, pág. 697. Por ello, el municipio no venía obligado a demostrar justa causa para la no renovación ni a celebrar procedimientos previos adicionales antes de la expiración de dichos nombramientos. Íd., pág. 700.

En consecuencia, concluimos que el TPI no erró al determinar que el apelante era un empleado transitorio sin expectativa jurídicamente protegida de permanencia ni al resolver sumariamente

las reclamaciones fundamentadas en una alegada expectativa de continuidad en el empleo. Por lo tanto, los primeros dos señalamientos de error no se cometieron.

Ahora bien, la conclusión de que el apelante no poseía una expectativa legítima de permanencia en el empleo no dispone automáticamente de sus restantes reclamaciones. Nuestro ordenamiento reconoce que aun los empleados transitorios están protegidos contra actuaciones discriminatorias por parte del Estado. Por ello, procede examinar si el TPI erró al desestimar sumariamente la causa de acción por alegado discrimen político.

En su cuarto señalamiento de error, el apelante sostuvo que existían controversias genuinas de hechos respecto a su afiliación política, el conocimiento de dicha afiliación por parte de la nueva administración municipal y la alegada relación causal entre esa circunstancia y la determinación de no renovar su nombramiento. Argumentó que tales asuntos dependían de inferencias relacionadas con intención, motivación y credibilidad, por lo que no podían resolverse mediante sentencia sumaria. Tampoco le asiste la razón.

Es cierto que los casos de discrimen frecuentemente involucran cuestiones relacionadas con intención o motivación. Sin embargo, ello no significa que toda alegación de discrimen deba necesariamente dilucidarse en un juicio plenario. Nuestro Tribunal Supremo ha reconocido que la sentencia sumaria continúa siendo un mecanismo disponible en este tipo de litigios cuando, luego de examinar la totalidad del expediente, la parte reclamante no logra identificar evidencia suficiente que establezca una controversia real y sustancial sobre los elementos esenciales de su causa de acción.

Como discutimos anteriormente, para prevalecer en una reclamación por discrimen político no basta con alegar que ocurrió un cambio de administración seguido de una acción adversa en el empleo. El empleado tiene el peso inicial de presentar evidencia que permita concluir razonablemente que su afiliación o ideología política

constituyó un factor sustancial o motivante en la decisión patronal impugnada. *López v. Miranda*, supra, pág. 561. Ello requiere prueba que sustente no solo la existencia de una afiliación política identificable, sino además el conocimiento de dicha afiliación por parte de los funcionarios responsables de la decisión y un vínculo entre esa circunstancia y la acción adversa alegada.

Examinado el expediente, observamos que el apelante no presentó evidencia suficiente para establecer una controversia material respecto a dichos elementos. Aunque hace referencia a la llegada de una nueva administración municipal y a su posterior separación del servicio una vez expiraron sus nombramientos transitorios, tales circunstancias, por sí solas, no permiten inferir razonablemente la existencia de discrimen político. De igual forma, tampoco identificó evidencia concreta que demostrara que los funcionarios responsables de la decisión tenían conocimiento de una afiliación político-partidista específica o que la misma hubiera influido en la determinación de no renovar sus nombramientos.

Más aún, el expediente refleja una explicación legítima y jurídicamente válida para la acción impugnada: la expiración de los nombramientos transitorios que ocupaba el apelante. Como ya hemos concluido, la determinación de no renovar dichos nombramientos no requería justa causa ni implicaba la privación de un interés propietario protegido. Ante ello, correspondía al apelante presentar evidencia que permitiera concluir razonablemente que dicha razón constituía un mero pretexto para encubrir motivaciones políticas. Sin embargo, la prueba sometida no alcanza ese nivel.

Nótese que el apelante tampoco presentó evidencia de expresiones discriminatorias, patrones de sustitución política, actuaciones diferenciadas dirigidas específicamente en su contra o cualquier otro elemento probatorio que razonablemente permitiera inferir que la decisión obedeció a criterios político-partidistas. En última instancia, su teoría descansa principalmente en especulación y

en la secuencia temporal de los acontecimientos. No obstante, las meras sospechas, conjeturas o inferencias no sustentadas por evidencia competente son insuficientes para derrotar una solicitud de sentencia sumaria debidamente fundamentada.

Al examinar el expediente en la forma más favorable al apelante, concluimos que la prueba presentada no genera una controversia real y sustancial respecto a si la alegada afiliación política constituyó un factor motivante en la determinación impugnada. En consecuencia, el TPI no erró al desestimar sumariamente la reclamación por discrimen político. Dicho esto, el cuarto señalamiento de error no se cometió.

Resuelto lo anterior, procede examinar la reclamación formulada al amparo de la Ley Núm. 44, *supra*, mediante la cual el apelante sostiene que fue objeto de discrimen por razón de una alegada condición de salud y que existían controversias de hechos respecto al conocimiento patronal de dicha condición y al trato recibido como consecuencia de esta. Particularmente, en su tercer señalamiento de error, el apelante sostuvo que el TPI erró al desestimar sumariamente su reclamación al amparo de la Ley Núm. 44, *supra*. En síntesis, indicó que existían controversias reales de hechos materiales en torno a si padecía una condición de salud protegida, si dicha condición fue debidamente notificada al patrono y si, a consecuencia de ello, fue objeto de trato discriminatorio en sus condiciones de empleo y en la decisión de no renovar sus nombramientos. Tampoco le asiste la razón.

La Ley Núm. 44, *supra*, prohíbe la discriminación en el empleo por razón de impedimentos físicos, mentales o sensoriales y extiende su protección a personas que puedan demostrar que poseen una condición que limita sustancialmente una o más actividades principales de la vida diaria, siempre que estén cualificadas para desempeñar las funciones esenciales del puesto, con o sin acomodo razonable. En consecuencia, para que proceda una causa de acción bajo dicho estatuto, el reclamante debe demostrar, entre otros

elementos, la existencia de una condición protegida y que la misma fue un factor en la acción adversa sufrida.

Asimismo, es norma reiterada que, en este tipo de reclamaciones, no basta con la mera alegación de la existencia de una condición médica. Es indispensable que la parte reclamante presente evidencia suficiente que permita inferir, al menos en esta etapa sumaria, que la condición alegada cumple con los criterios estatutarios de protección y que el patrono conocía o debía conocer dicha condición al momento de tomar la decisión impugnada.

Examinado el expediente ante nuestra consideración, coincidimos con el TPI en que el apelante no logró establecer la existencia de controversias materiales que impidieran la disposición sumaria de esta causa de acción. En primer lugar, la certificación médica sometida, aun interpretada de la manera más favorable al apelante, no contiene elementos suficientes que permitan concluir que este padecía una condición que lo incapacitara sustancialmente en las actividades principales de la vida diaria dentro del significado de la Ley Núm. 44, *supra*. Más importante aún, el expediente no contiene evidencia que demuestre de manera adecuada y no especulativa que dicha información fue comunicada al patrono con suficiente claridad, oportunidad o formalidad como para activar las obligaciones legales correspondientes.

A ello se suma que el apelante tampoco presentó prueba que estableciera un nexo causal entre la alegada condición de salud y la determinación de no renovar sus nombramientos transitorios. Como ya hemos señalado, la expiración de un nombramiento transitorio constituye, como regla general, una cesantía al vencimiento del término y no una acción disciplinaria o adversa que requiera justificación por parte del patrono. En ausencia de evidencia que sugiera que la condición de salud fue un factor sustancial o motivante en la decisión impugnada, la reclamación no puede sostenerse más allá de la etapa sumaria.

De igual forma, las alegaciones del apelante en cuanto a supuestos cambios en condiciones de trabajo o trato diferenciado posterior a la alegada notificación de su condición no encuentran suficiente respaldo en el expediente como para generar una controversia real y sustancial de hechos. Por el contrario, dichas alegaciones descansan principalmente en inferencias y apreciaciones subjetivas que no alcanzan el umbral probatorio requerido para derrotar una sentencia sumaria.

En consecuencia, concluimos que el TPI actuó correctamente al determinar que no existían controversias materiales que justificaran la celebración de un juicio en los méritos en cuanto a la reclamación al amparo de la Ley Núm. 44, *supra*, y al disponer sumariamente de la misma. Por lo tanto, el tercer señalamiento de error no se cometió.

Resuelto lo anterior, procede atender el último señalamiento de error, mediante el cual el apelante impugnó la desestimación de sus reclamaciones bajo la Ley Núm. 115, *supra*, y el Art. 1536 del Código Civil, *supra*, así como la causa de acción por daños y perjuicios en general. Particularmente, en su quinto señalamiento de error, el apelante impugnó la desestimación sumaria de su causa de acción en daños y perjuicios y de las reclamaciones relacionadas bajo la Ley Núm. 115, *supra*, así como aquellas fundamentadas en alegadas actuaciones negligentes del patrono. En esencia, sostuvo que el TPI erró al no reconocer que su querella alegaba un patrón de conducta hostil, cambios adversos en las condiciones de empleo, inacción ante sus reclamos y daños emocionales y económicos, lo cual, a su entender, requería la celebración de un juicio en sus méritos. Tampoco le asiste la razón.

En lo pertinente a la Ley Núm. 115, *supra*, dicho estatuto prohíbe las represalias contra empleados que participen en actividades protegidas, tales como ofrecer testimonio o información ante foros judiciales, administrativos o legislativos, o en procedimientos internos del patrono. Para establecer un caso *prima facie* bajo este estatuto, el

empleado debe demostrar que participó en una actividad protegida y que, con posterioridad, sufrió una acción adversa en el empleo. *S.L.G. Rivera Carrasquillo v. A.A.A.*, supra, pág. 362. Una vez establecido dicho umbral, corresponde al patrono articular una razón legítima para la acción impugnada, y al empleado demostrar que la razón alegada constituye un mero pretexto. Íd.

Examinado el expediente, concluimos que el apelante no presentó evidencia suficiente para establecer, ni siquiera en esta etapa preliminar, la existencia de una actividad protegida claramente identificada ni un nexo causal entre dicha actividad y la decisión de no renovar sus nombramientos transitorios. Aún más, como hemos reiterado, la expiración de un nombramiento transitorio constituye una determinación administrativa amparada en el vencimiento del término de vigencia del nombramiento, lo cual, por sí solo, no activa la presunción de represalia bajo la Ley Núm. 115, *supra*. En ausencia de prueba que permita inferir razonablemente que la decisión obedeció a la participación del apelante en una actividad protegida, la causa de acción no puede sostenerse.

En cuanto a la reclamación de daños y perjuicios al amparo del Art. 1536 del Código Civil, *supra*, es norma reiterada que para imponer responsabilidad extracontractual es indispensable demostrar la concurrencia de un acto u omisión culposa o negligente, un daño real y un nexo causal entre ambos. En el presente caso, el apelante no presentó evidencia independiente que estableciera una actuación culposa o negligente del patrono distinta de las alegaciones de discrimen y represalia ya analizadas y descartadas conforme a derecho. Así, al no subsistir las causas de acción estatutarias que le sirven de fundamento, tampoco procede la reclamación en daños y perjuicios en ausencia de prueba adicional que sostenga los elementos esenciales de la responsabilidad civil.

En atención a lo anterior, colegimos que el TPI no erró al desestimar sumariamente las reclamaciones al amparo de la Ley Núm.

115, *supra*, ni la causa de acción en daños y perjuicios, toda vez que el apelante no logró establecer la existencia de controversias materiales de hechos que requirieran la celebración de un juicio en sus méritos.

En conclusión, luego de examinar detenidamente la totalidad del expediente ante nuestra consideración, los señalamientos de error planteados por el apelante y el derecho aplicable, resolvemos que el TPI actuó correctamente al disponer del caso mediante sentencia sumaria. El apelante no logró derrotar la moción de sentencia sumaria mediante la presentación de evidencia que estableciera controversias reales, sustanciales y pertinentes sobre hechos materiales esenciales a sus causas de acción. En ausencia de tales controversias, procedía la aplicación del derecho a los hechos incontrovertidos, conforme a la Regla 36 de Procedimiento Civil, *supra*. Por consiguiente, se confirma en su totalidad el dictamen apelado.

IV.

Por los fundamentos antes expuestos, ***confirmamos*** el dictamen apelado.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones